# EXHIBIT A

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF RIVERSIDE

MAY 1 5 2024

T. Hill

1   Stephan Dean
    Liza Dean / DBA Sure File Filing Systems
2   37187 Bankside Drive, #2
    Cathedral City CA 92234
3   Telephone: (323) 314-9692
    SUREFILE@MSN.COM
4   In Pro Se
5

6               SUPERIOR COURT OF THE STATE OF CALIFORNIA
7                   COUNTY OF RIVERSIDE (PALM SPRINGS BRANCH)

8   STEPHAN C DEAN   LIZA D Dean        Case No.:   CVPS 2 4 0 2 8 8 4
    INDIVIDUALLY AND DBA SUREFILE
9   FILINGS SYSTEMS,                    Assigned to:
                                        COMPLAINT
10              Plaintiffs,
                                        JURY TRIAL DEMANDED
11      v.

12  KAISER FOUNDATION HEALTH            BREACH OF CONTRACT
    PLAN, INC; KAISER FOUNDATION        Request for judicial notice attached and
13  HOSPITALS; DOES 1-50 INCLUSIVE      incorporated by reference in this complaint
                                        the Declaration of Thomas Stefanelli and the
14              Defendants.             July 31, 2013 Transcript on Deans motion for
                                        summary judgement
15  Plaintiffs Stephan Dean and Liza Dean; individually and doing business as SureFile Filings

16  Systems, allege:

17                      I. PARTIES AND RELEVANT PERSONS
18
19      1. Plaintiffs Stephan Dean and Liza Dean reside in Cathedral City California and do

20  business as Surefile Filing Systems. They are referred to herein collectively as "DEAN".

21  Even though DEAN is referred to herein in the singular for convenience, it refers to both Stephan

22  and Liza Dean unless specified otherwise.

23
        2. Defendants Kaiser Foundation Health Plan, Inc. is a corporation that does business
24
25  throughout California, including Riverside County.

26      3. Defendant Kaiser Foundation Hospitals is an unincorporated entity that does business

27  throughout California, including Riverside County and is an affiliate of Kaiser Foundation

28

                                    COMPLAINT
                                       - 1 -

1    Health Plan, Inc. Kaiser Foundation Health Plan, Inc. and Kaiser Foundation Hospitals are

2    referred to herein collectively as "KAISER".

3        4. Defendants named herein as DOES 1-50 inclusive are presently unknown to

4

5    Dean who therefore names said defendants by such fictitious names. When the true

6    names and capacities of said Defendants DOES 1-50 are ascertained, this Complaint will be

7    amended accordingly.

8        5. DEAN is informed and believes and thereon alleges that at all times herein

9

10   mentioned, the DOE Defendants and Kaiser Foundation Hospitals were the agents,

11   employees, co-venturers, affiliates, or partners of each other Defendant and of Kaiser

12   Foundation Health Plan, Inc. and in doing or planning the actions herein alleged, each

13

14   Defendant was acting with the course and scope of that agency, employment, partnership

15   or joint venture with the knowledge, consent, and approval of each other Defendant.

16                **The Contracts Between DEAN and KAISER**

17       6. For decades the Dean family has done business with Kaiser. Between 2008 and 2010,

18

19   DEAN and KAISER entered into two written contracts and numerous verbal agreements by

20   which KAISER transmitted to DEAN certain information about some of KAISER's patients or

21   members for storing and scanning by DEAN on DEAN's computers until requested by KAISER.

22   The written contracts are commonly referred to as the "West Los Angeles Agreement" and the

23   "Moreno Valley Agreement" (collectively, along with the verbal agreements, "the

24   Storage/Scanning Contracts"). Both contracts contained a prohibition on Dean using the Kaiser

25   trademark or name in advertising unless it was affirmatively granted in writing by Kaiser.

26

27       *Publicity.    Supplier will not, without the prior written consent of Kaiser*

28   *Permanente, use in advertising, publicity, on the internet or otherwise the names, trade*

*names, service marks, trade dress or logo of Kaiser Permanente, the Kaiser Permanente*

*Medical Care Program or any affiliates of these entities or refer to the existence of this*

*Agreement in any press releases, advertising, web sites or material distributed or made*

*available to prospective customers or other third parties.*

7. In 2010, KAISER terminated the Storage/Scanning Contracts. KAISER demanded that

DEAN retransfer to KAISER all the paper documents regarding KAISER's patients that

KAISER had transferred to DEAN. DEAN did retransfer to KAISER the paper documents.

### The Settlement Agreement

8. In 2010 and 2011 KAISER and Dean had disagreements over their respective rights,

and duties regarding the terminated Storage/Scanning Contracts, which had been terminated by

Kaiser. Representing Kaiser was Holly Burke their inhouse attorney and representing Dean was

Thomas Stefanelli. Request for judicial notice attached and incorporated by reference in this

complaint is the Declaration of Thomas Stefanelli (Exhibit 1). See Pacific Gas & Elec. Co. v.

G.W. Thomas Drayage & Rigging Co., 69 Cal.2d 33, 37, 69 Cal.Rptr. 561, 442 P.2d 641 (1968)

holding that, under California law, "[t]he test of admissibility of extrinsic evidence to explain the

meaning of a written instrument is not whether it appears to the court to be plain and

unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to

which the language of the instrument is reasonably susceptible." In the case at bar the term

"other claims" and "future claims" are ambiguous.

9. Kaisers rule of engagement was predicated on the parties agreeing without limitation to

a bi lateral, fully integrated release of any and all claims they had against each against each other

both past, present and future and that the agreement supersede all other agreements and be a final

resolution of the parties business relationship including a waiver of California 1542 (unknown

claims). As is evident from the Declaration, Kaisers main intent was that Dean be prohibited from using the KAISER name or logo in the future in his business unless Kaiser affirmatively granted that right in writing as was incorporated (publicity clause) in the terminated Storage/Scanning contracts. Ms. Burke made this intent clear and wanted this claim to survive this fully integrated bi lateral settlement and release of all future claims.

> *As I mentioned in my email last night, I believe the Publicity clause in the executed contract with Surefile restricts Surefile from using the KP name or logo without KP consent (see email below). KP does not intend to modify this requirement. If Surefile wants to use KP's name, Mr. Dean should contact Jules Parent in KP's Procurement & Supply organization, to obtain prior written consent. Mr. Dean has Jules' contact info.*

10. After negotiating with DEAN and his counsel regarding whether DEAN would be prohibited from using the KAISER name and logo in DEAN's future businesses without Kaiser affirmatively granting it by written authorization and the price of such a prohibition, KAISER elected not to include such a provision in the Settlement Agreement and as a result, to pay a lower amount to DEAN than KAISER would have had to pay in order to include this affirmative granting of rights in the Settlement Agreement. This decision was made after full consideration by KAISER executives and its counsel; KAISER knew and understood that because of its deliberate choice, it would thenceforth be legally unable to prevent DEAN from using the KAISER name or logo in his future business, without their affirmative granting of it as in the terminated storage/scanning contracts. This constituted not only kaiser releasing of any future trademark claim against the Deans but also Kaiser bargained away that right and made it part of the consideration to Dean. As is clear from Ms. Burkes email of March 8, 2011, Dean made an

offer and Kaiser accepted it. For ninety thousand dollars the Plaintiffs bargained for the right to

use Kaisers name and trademark in the future without the need for Kaiser affirmatively granting

its permission (publicity restrictions). In exchange for Kaiser releasing of that right (publicity

restrictions) to Dean as consideration and paying Dean for past services rendered of 110

thousand dollars, the Deans in return agreed to include a bi lateral release of any and all future

claims against Kaiser they had related to the terminated Storage/scanning contracts including a

waiver of California 1542.  The Kaiser executive Laurel Junk who was head of Kaisers

procurement and supply organization, signed the agreement having full authority to act on behalf

of Kaiser on these issues.  Indeed, Ms. Junk, was Jules Parents superior.

From: Holly.B Burke@kp.org <Holly.B.Burke@kp.org>
Subject: Action· Claim of SuraGle - Need Confirmation of Existing Situation
To: lawstef7771@yahoo com·
Date: Tuesday, March 8, 2011, 6.08 PM

Hi Tom,

I'm really sorry to hear about your Dad.

Thanks for getting back to me  I wanted to get confirmation on  the current Dean offer
I want to minimize any confusion at this important point.

I wondered if you could confirm my understanding  As I understand the new offer, we
have two options.

1. Option 1  $110K to settle with the previous language re. confidentiality. Please see
Option 1 document, which is Version 9 (without additional confidentiality and publicity
restrictions). I want to confirm if the document as marked was the acceptable version
to go with Option 1  We would need to update the dates in this version

2  Option 2: $200k with updated language re confidentiality publicity and
disparagement. Please see Option 2 document, which is Version g that I sent to you
in mid-Jan  We would need to update the$ amounts and dates in this version.

Option 1 Document:

Option 2 Document:

Can you let me know if this is correct?

Thanks much,
Holly

THE LAW

11. California contract law is clear on this **"Courts will not add a term about which a contract is silent."** Dameron Hosp. Assn. v. AAA N. Cal., Nevada & Utah Ins. Exch., 229 Cal. App. 4th 549, 569 (2014). Like the Deans contention here, the Dameron plaintiff contended that a health plan it contracted with had an obligation to help it pursue additional payments from third parties, even though the contract did not say so, based on a history of cooperation. Id. at 568-69. The court rejected this argument, explaining that the "contract's silence as to any obligation to assist in collection from third party tortfeasors does not allow us to graft a new obligation into the agreement." Id. at 569. Instead, the court explained, its "function is to determine what, in terms and substance, is contained in the contract, not to insert what has been omitted." Id. *Simply put, "[c]ourts will not add a term about which a contract is silent." Id.* (emphasis added).

12. California law and the facts and evidence in support of this complaint make it abundantly clear that once the plaintiffs in this case executed the Settlement agreement the Deans and Laurel Junk on behalf of Kaiser. Provides that the Settlement agreement shields the Deans from future liability regarding the use of Kaisers Name and Trademark. Kaiser cannot now graft a (publicity restriction or clause) into the this fully integrated bi lateral settlement agreement that they now wish were there and bargained away, any more than the Dameron plaintiff could add a term based on past history. In the case at bar a term requiring Dean to have written authorization to use the Kaiser name and Trademark as was in the terminated storage/scanning contracts which are superseded by the Settlement agreement. Exhibit 2. (The Settlement Agreement) of March 24, 2011.

**The Kaiser Lawsuit Results in judgement for Dean**

13. In 2012, the plaintiffs in this case had disagreements regarding DEAN's rights under the Settlement Agreement and other matters. The parties attempted to settle their differences but could not agree on the consideration the Deans would except to release their surviving claims against Kaiser (one of the claims was Deans claims of omissions). On October 12, 2012, KAISER filed a civil action in the Riverside Superior Court entitled Kaiser Foundation Health Plan, Inc. and Kaiser Foundation Hospitals, plaintiffs v. Stephan Christopher Dean, Liza Dean, dba SureFile Filing Systems and Does 1-10 inclusive, RSC No. INC 1207224 ("the Kaiser Lawsuit"). The complaint contained four causes of action; the main cause was that the Deans breached the parties Business Associate Agreement (BAA) by retaining patient information on their computers, which was fully incorporated in the terminated storage/scanning contracts. What is irrelevant in the Kaiser lawsuit of 2012 was the subject matter, whether it was about the BAA or the terminated Storage/Scanning contracts being breached.  This lawsuit could have been about trademarks and the Deans allegedly breaching the terminated Storage/Scanning contracts by creating a website using the Kaiser name without their written authorization or alternatively Dean retaining patient information allegedly breaching the BAA as Kaiser was claiming, notwithstanding the outcome would be the same. It is unknown whether Kaiser will now contend that this lawsuit in 2012 pertained to patient information and had nothing to do with Trademarks and therefore this courts preliminary interpretation of the settlement agreement is not relevant. That argument is futile and should be rejected as it would create a litigation nightmare by having the plaintiffs in constant litigation because of the ambiguous term "other claims" "and "future claims." The Settlement agreement supersedes them both (BAA, terminated Storage/Scanning contracts) and what is important is what the settlement agreement includes and does not include.

13. What is relevant was the Deans motion for summary judgement in response to this 2012 lawsuit and the basis for it, and Kaisers response or lack of one. Most important was this court's preliminary interpretation of the settlement agreement in this 2012 lawsuit and the question this court raised. "The question becomes did Kaiser give up all those rights that they otherwise may have had to assert a breach of the BAA, ( or in the case at bar a breach of the terminated Storage/Scanning contracts) by entering into a settlement agreement which purports to give up all claims, past, present, and future, with the exception of what is carved out under paragraph 13 of the settlement agreement?" In the case at bar paragraph 13 is very relevant because it does not mention anything about Kaiser trademarks being carved out of the terminated Storage/Scanning contracts and surviving, the very language (publicity restrictions) Ms. Burke bargained away and wanted to include in paragraph 13. The Deans do not contend that the ambiguous terms "other claims" and "future claims" allow them to drive their car through Kaisers doors and say the agreement shields them from all future claims.  That would turn contract law on its head and require pages and pages of what parties to a contract can and cannot do, as stated earlier, it being no different than Kaiser now claiming that trademarks were not mentioned in this 2012 lawsuit only patient information, so this courts preliminary interpretation of the 2011 settlement agreement is irrelevant. The Deans are claiming the ambiguous term "other claims" and "future claims" in the settlement agreement relates to Kaisers name and trademark, which in the terminated Storage/Scanning contracts Kaiser did maintain that affirmative right but as the facts and evidence proves bargained that term away.  On July 13, 2013, a hearing was held in the Kaiser Lawsuit on Deans motion for summary judgment. The Deans motion asserted that in the Settlement Agreement Kaiser had released any claim against Dean. Kaiser, though its attorney Tom Freeman, argued that the Settlement Agreement applied

1   only to the money debts that Kaiser had to Dean under the terminated Storage/Scanning

2   Contracts of 110 thousand dollars and any future money claims related to the Deans past services

3   rendered in the terminated contracts. This court rejected Kaisers argument and held that the

4
5   Settlement Agreement applied to any claim of any kind against Dean including future claims.

6   Request for judicial notice attached and incorporated by reference in this complaint Exhibit 3.

7   Transcript of July 13, 2013, hearing on Deans motion for summary judgement.

8   THE COURT:  Did it define the dispute? MR. FREEMAN:  It does.

9   THE COURT:  And would you read that to the court, and for the record, as to how it defines the

10  dispute.
11
12  MR. FREEMAN:  So in the recitals, it says:  "Whereas, Surefile asserts that it has yet to be fully

13  compensated for services performed and costs incurred in providing services to KP, and has

14  alleged other claims against KP -- "

15  THE COURT:  Stop right there.  "Other claims against

16  KP."  Do they identify what those other claims are?
17
18  MR. FREEMAN:  They do not define them in the settlement agreement.

19  THE COURT:  And in addition to the dispute that you identified in that language, the settlement

20  agreement goes on to purport to settle any and all claims that one has against the other, both past,

21  present, and future.  In fact, known and unknown claims.

22  MR. FREEMAN:  It does. And -- and I'll concede that perhaps some of that language is not as
23
24  precise, which we would now hope it would have been.

25          14. On August 20, 2013, this court entered its order granting the summary judgment

26  motion but allowed KAISER to file an amended complaint permitting KAISER to present

27  extrinsic evidence as to the parties intent (as the Deans are in this complaint) in drafting the

28

settlement agreement. Kaiser declined to do so, and on September 13, 2013, the Kaiser Lawsuit was dismissed with prejudice by Kaiser, leaving the summary judgment intact.

THE COURT: Okay. But then we -- then you are triggered by a fully integrated document. Are you going to introduce parol evidence to try and defeat paragraph 18, which fully integrates into this settlement agreement all prior agreements, negotiations, or understandings?

MR. FREEMAN: Yes. Your Honor, what it comes down to is the fact that Ms. Burke negotiated this agreement understanding that the dispute that was being resolved was the compensation for the Deans' services.

THE COURT: Despite language to the contrary. So she's going to submit a declaration to the court saying that "I drafted this release agreement, I chose the words within this release agreement, I made it all-encompassing, but, oh, by the way, I did not intend it to be a fully and completely integrated release agreement, releasing all known and unknown claims" and then specifically making reference to 1534? She's going to say that? I mean, she essentially already has.

MR. FREEMAN: She has said that Your Honor.

15. Kaisers lawyer, Tom Freeman, throughout the hearing stated that Kaisers was going to amend the complaint, even stating, "there be no ambiguity about the fact." It is uncertain whether Kaiser will now try and use "smoke and mirrors" that they were induced to dismiss the 2012 complaint with prejudice because the Deans somehow convinced them to, that argument should be rejected. The Deans were ready to go to trial and allow Kaiser to present extrinsic evidence as to the parties intent in drafting the settlement agreement, and explain the ambiguous term "other claims" in the settlement agreement. Notwithstanding Kaiser did the prudent thing, a cut and run, dismissing this 2012 complaint with prejudice. The reasoning behind Kaisers

decision is obvious, the extrinsic evidence (Exhibit 1 Declaration of Thomas Stefanelli attached and incorporated by reference in this complaint) would have proven the Deans contention they make in this complaint over a decade later. The ambiguous term "other claims "related to the Deans future use "future claims" of Kaisers name and Trademark.  Kaiser on March 24, 2011, could no longer legally stop the Deans from using their name or trademark by requiring the Deans to have their affirmative granting in writing as was in the terminated storing/scanning contracts. The Settlement agreement shields the Deans from future liability for their actions post dating its execution regarding the use of the Kaiser name or trademark, the facts and evidence presented in this complaint prove this material fact. The cited Dameron case is just one of many that set legal precedent, Kaiser cannot now graft this new term into this fully integrated bi lateral settlement and release agreement which as consideration to Dean bargained away, just because it was in the previous terminated storage/scanning contracts. **"Courts will not add a term in which a contract is silent."**

### The ICANN Arbitration over DEAN's Domain Name

16. On October 15, 2021, KAISER submitted to ICANN (a nationwide clearing and enforcement organization for internet domain names) a complaint against DEAN alleging that DEAN had wrongfully used KAISER's trademarked name and logo on his website. On December 7, 2021, the arbitrators issued their decision. The arbitrators found that DEAN had wrongfully and in bad faith created a domain that infringed KAISER's rights and ordered that the domain name kphealthconnectusa.com be transferred to KAISER. The panel decided that because the settlement agreement contained no affirmative granting of the right for the Deans to use the Kaiser trademarks or name that the Deans had infringed on Kaisers Trademark.  They also noted that an omission does not magically create an affirmative granting of rights and that Kaiser never would have known about potential cybersquatting eleven years before it happened.

The arbitrators decided they had the authority to graft a new term into this fully integrated agreement, in this case a term which Kaiser in 2011 bargained away as part of the consideration to Dean.    As of March 24, 2011, Kaiser no longer had a legal right to submit a claim with ICANN against Dean and was aware of this material fact when initiating the ICANN claim. Kaisers actions in this matter constitute a Breach of the March 24, 2011, Settlement agreement and release.

### [Breach of Contract]

17. DEAN incorporates by reference the allegations of paragraphs 1-16 above. The actions of KAISER in bringing and pursuing the ICANN Dispute, in taking the domain name created and used by DEAN, and in continuing to assert that DEAN has no right to use the KAISER name or logo are all breaches of the Settlement Agreement in which KAISER bargained away and released all such claims. Such breaches of the Settlement Agreement are substantial causes of damage to DEAN in that he is unable to pursue his future business using Kaisers name or trademark, which he is contractually entitled to do, and which KAISER cannot legally prevent. The amount of damage caused to DEAN by the breaches of KAISER are uncertain but exceeds $100,000. DEAN will establish the true amount at trial.

18. Dean incorporates by reference the allegations in paragraphs 1-17. The actions of KAISER as alleged herein were done with the object of intimidating the DEANS from in the future using Kaisers name or trademark in their businesses, with a conscious disregard  KAISER intentionally with disregard of the DEAN rights that KAISER knew they had, were despicable, malicious, and oppressive in that they were done solely to injure DEAN and make him spend money they did not have to defend the rights KAISER knew they had and acts that no reasonable person would accept. Therefore, DEAN is entitled to an award of punitive damages in an amount

to be determined at trial.

WHEREFORE, DEAN prays for judgment against all defendants, jointly and severally, as follows:

    1. For damages in an amount to be proved at trial but not less than 100,000.00.

    2. For punitive damages according to proof

    3. For costs of suit herein incurred, and

    4. For all other and further relief to which DEAN is entitled.

Dated: May 14, 2024

STEPHAN C. DEAN & LIZA D DEAN

Pro Se

EXHIBIT 1

Stephan Dean
Liza Dean
37187 Bankside Drive, #2
Cathedral City, CA 92234
Telephone: (323) 314-9692

Plaintiffs in Pro Per

SUPERIOR COURT FOR THE STATE OF CALIFORNIA

COUNTY OF RIVERSIDE

STEPHAN DEAN AND LIZA DEAN
INDIVIDUALLY AND DBA SUREFILE
FILING SYSTEM;

        Plaintiffs,

    vs.

KAISER FOUNDATION HEALTH PLAN,
INC.; KAISER FOUNDATION HOSPITALS;
DOES 1-50 INCLUSIVE

        Defendants

Case No:

DECLARATION OF THOMAS
STEFANELLI, ESQ.

I, Thomas Stefanelli, Esq., declare and state as follows:

1.      I am an attorney licensed to practice before all of the Courts of the State of California.
I have personal knowledge of the matters and facts contained within this declaration and if called
upon as a witness I could and would competently testify to said matters and facts.

2.      I am the attorney who was assisting Stephan Dean, Liza Dean and Surefile Filing
System in a dispute against Kaiser Foundation Health Plan, Inc./Kaiser Foundation Hospitals
back in or about 2010/2011. Specifically, Stephan Dean, Liza Dean and Surefile Filing System
were threatening Kaiser Foundation Health Plan, Inc./Kaiser Foundation Hospitals with litigation

-1-
DECLARATION OF THOMAS STEFANELLI

related to Kaiser's failure to pay for services rendered by the Deans. On or about November 29, 2010, I, on behalf of the Stephan Dean, Liza Dean and Surefile Filing System, sent a letter to Holly Burke, Senior Counsel for Kaiser, offering on behalf of my clients to sign a release of all claims against Kaiser in return for a payment from Kaiser in the amount of $110,160.

3.      On or about December 14, 2010 I received from Holly Burke a Settlement Agreement and Release prepared by Kaiser and noted to be "for discussion purposes only". This proposed Agreement and Release was to be signed by my clients and on behalf of Kaiser Foundation Health Plan Inc. and Kaiser Foundation Hospitals. It called for the payment of $100,000 from Kaiser to my clients. It also specified as follows:

> WHEREAS, the parties to this Agreement now desire to settle and compromise any claims they might possess against the other, settle the Dispute and otherwise resolve any outstanding issues as more fully set forth herein.
>
> The Settlement Funds shall be in full and final settlement and compromise of any claims they might possess against the other, including without limitation the Dispute and any counterclaims and allegations related to or in connection with the Dispute for all times prior to and after the Effective Date.
>
> Non-Disclosure. The nature and terms of this Agreement shall not be disclosed by any party hereto or its agents, attorneys, or any other representative, without the prior written consent of all of the other parties; provided, however, that any party may disclose the existence of this Agreement, and the nature and terms thereof, (i) to the attorneys, accountants, and financial and tax advisors of that party, (ii) as required or compelled by law, or (iii) to enforce the provisions of this Agreement.

4.      Throughout the rest of December 2010, I, on behalf of the Deans and Surefile and Holly Burke on behalf of Kaiser continued to attempt to negotiate a settlement. On behalf of the Deans, I was demanding $110,000 (not the $100,000 mentioned in the original Settlement Agreement and Release prepared by Kaiser). I was also demanding a hold harmless clause

-2-

DECLARATION OF THOMAS STEFANELLI

requiring Kaiser to indemnify and hold harmless my clients from any third party claims (due to potential HIPAA violations associated with my client having access to medical record information). I was also demanding that Kaiser eliminate a 25% holding on the settlement funds for tax purposes. Holly Burke, in turn, was demanding that the non-disclosure clause be extended to preclude disclosure of not only the nature and terms of the agreement, but also of "services provided". An amended Settlement Agreement and Release was prepared by Kaiser noted again to be for "discussion purposes only" with the offer from Kaiser noted to expire on December 29, 2010.

5.        On or about December 27, 2010 I received an amended Settlement Agreement and Release from Holly Burke from Kaiser, which was again noted to be "for discussion purposes only". The agreement called for a payment from Kaiser to my clients in the amount of $110,000, included the hold harmless clause and removed any 25% withholding for tax purposes. The new proposed agreement continued, however, to require non-disclosure by my clients not only of the nature and terms of the agreement but also of "services provided". This offer from Kaiser was again noted to expire on December 29, 2010. My clients were agreeable to the settlement at that point as written, including the fact that it was a full and complete settlement of all claims that the parties might possess against each other. The only clause that my clients did not agree to at that time was the addition made by Kaiser to the non-disclosure clause precluding my clients from disclosing "services rendered".

6.        The deadline to accept Kaiser's offer (December 29, 2010) came and went. On or about January 7, 2011 I reached out to Holly Burke advising of my clients' desire to continue settlement negotiations but specifically advised that if Kaiser wanted the additional term of the non-disclosure agreement, then additional compensation beyond the $110,000 was required.

-3-

**DECLARATION OF THOMAS STEFANELLI**

7.     On or about January 8, 2011 Holly Burke got back to me.  Her email included the following:

> As you can imagine, I'm a bit disappointed we couldn't close this off last year. I fear that Mr. Dean is backing himself into a corner with little upside.
>
> As you are aware, my client's offer to do a complete settlement in consideration for a payment of $110,000 has expired. Sounds to me like your client never really intended to do a complete release. I had tried to be very clear that the only basis for resuming discussions with Mr. Dean last year was based on Mr. Dean's agreement to release all claims. I was quite surprised that Mr. Dean felt he had some surviving claims.

8.     My clients and I were rather confused by this email.  As indicated above, my clients were agreeable to the proposed settlement agreement whereby the parties would release any and all claims against each other in return for a payment by Kaiser to my clients of $110,000.  It was only Kaiser's insistence that the non-disclosure clause be extended beyond non-disclosure of the nature and terms of the agreement to include non-disclosure of "services provided" that was holding up the settlement.

9.     On or about January 10, 2011 I responded to Holly Burke as follows:

> My client remains interested in settling his claims, in total, for $110,000. His objection to going through with the settlement was in relation to confidentiality language you added to the release. One might argue that a confidentiality clause is becoming a clause routinely included in Settlement Agreements. The usual confidentiality clause relates, however, only to the terms of the settlement. I have never heard of a confidentiality clause being extended to include all dealings between the parties.
>
> My client has made his living for many years working for Kaiser. He is not prepared to agree to a confidentiality clause that precludes him from referring to that work history, without substantial compensation. In these economic times, it will be difficult for him to find new work. It will be almost impossible if he is precluded from giving a work history because of a

-4-

**DECLARATION OF THOMAS STEFANELLI**

1   confidentiality clause that extends beyond the terms of the settlement.

2

3   10.    On or about January 10, 2011 Holly Burke responded to my email noted above. Now

4   produced and shown to me and marked as Exhibit "A" to this my declaration is a true copy of the

5   email that I received. As can be seen, Holly Burke indicated that my clients had, in previous

6   contracts with Kaiser Permanente, agreed not to publicize his work for KP. As can be seen, she

7

8   quoted language from those/that previous agreement(s). She specifically quoted as follows:

9              Publicity. Supplier will not, without the prior written consent of
10             Kaiser Permanente, use in advertising, publicity, on the internet or
               otherwise the names, trade names, service marks, trade dress or
11             logo of Kaiser Permanente, the Kaiser Permanente Medical Care
               Program or any affiliates of these entities or refer to the existence
12             of this Agreement in any press releases, advertising, web sites or
13             material distributed or made available to prospective customers or
               other third parties.

14

15  11.    The proposed Settlement Agreement and Release prepared by Kaiser related to this

16  ongoing dispute included the following: "Entire Agreement. This Agreement states the entire

17  agreement among the parties who have executed this Agreement and supersedes their prior

18  agreements, negotiations or understandings." In light of the fact that by the very terms of this

19  new proposed Settlement Agreement and Release, prior Agreements with Kaiser would be

20  superseded, it was my and my clients understanding that Kaiser was adding new language to the

21

22  proposed non-disclosure clause to prevent my clients from: "use in advertising, publicity, on the

23  internet or otherwise the names, trade names, service marks, trade dress or logo of Kaiser

24  Permanente, the Kaiser Permanente Medical Care Program or any affiliates of these entities or

25  refer to the existence of this Agreement in any press releases, advertising, web sites or material

26  distributed or made available to prospective customers or other third parties".

27

28

-5-

DECLARATION OF THOMAS STEFANELLI

12.    On or about January 11, 2011 I received another email from Holly Burke which confirmed in my mind and the minds of my clients our understanding of the reason why Kaiser was insisting on the extension of the non-disclosure clause to include "services provided". The new email from Holly Burke reads in pertinent part as follows:

> As I mentioned in my email last night, I believe the Publicity clause in the executed contract with Surefile restricts Surefile from using the KP name or logo without KP consent (see email below). KP does not intend to modify this requirement. If Surefile wants to use KP's name, Mr. Dean should contact Jules Parent in KP's Procurement & Supply organization, to obtain prior written consent. Mr. Dean has Jules' contact info.

Now produced and shown to me and marked as Exhibit "B" to this my declaration is a true copy of the January 11, 2011 email I received from Holly Burke.

13.    On January 12, 2011 I received another email from Holly Burke of Kaiser.  It reads in pertinent part as follows:

> Please note that the no publicity clause applies across the board to all of our vendors. I believe it is enforceable as Kaiser Permanente is a protected mark. I believe KP is firmly entitled to prevent a party from using this mark and logo for commercial purposes.

Now produced and shown to me and marked as Exhibit "C" to this my declaration is a true copy of the January 12, 2011 email.

14.    On January 14, 2011 I received another email from Holly Burke at Kaiser.  Now produced and shown to me and marked as Exhibit "D" to this my declaration is a true copy of said email.  As can be seen, it became very apparent through her emails that Kaiser was very concerned about the ability of my client to use the Kaiser name in any fashion. The email reads in pertinent part as follows:

-6-

**DECLARATION OF THOMAS STEFANELLI**

> I had some ideas this morning while at the gym. Just a thought - what if we modified the confidentiality clause with respect to "services" so that Dean would be precluded from disclosing confidential or proprietary info about the services, including the name of Kaiser Permanente. In effect, this would give Dean the right to talk to future prospective customers about its background providing the storage services without disclosing confidential aspects of this service or KP's name?

15.    On January 14, 2011 I received yet another email from Holly Burke from Kaiser. Again she explained that her purpose in amending the disclosure clause was to preclude my clients from using the Kaiser name. Now produced and shown to me and marked as Exhibit "E" to this my declaration is a true copy of said email.

16.    On January 14, 2011 I notified Holly Burke by email that a settlement offer of $110,000 was inadequate if Kaiser insisted on the additional term added to the non-disclosure clause. I notified that my clients were willing to accept that additional term but wanted additional compensation from Kaiser.

17.    On March 8, 2011 I sent an email to Holly Burke indicating that my clients would, in return for a payment of $110,000, sign a Settlement Agreement and Release waiving all claims and a non-disclosure clause precluding them from discussing the terms and conditions of the Agreement. If Kaiser continued to insist upon the non-disclosure clause going further, my clients would agree to sign a Settlement Agreement and Release in return for a payment of $200,000.

18.    Holly Burke from Kaiser got back to me on March 8, 2011 asking for confirmation of our two offers. Now produced and shown to me and marked as Exhibit "F" to this my declaration is a true copy of her email.

19.    On or about March 24, 2011 Kaiser elected to go with the payment of $110,000 with the Settlement Agreement only precluding disclosure of the nature and terms of the Agreement. The

-7-

**DECLARATION OF THOMAS STEFANELLI**

1   Settlement Agreement was signed by the parties and it is the Settlement Agreement and Release

2   that has been considered by this court in prior hearings in this action.

3        I declare under penalty of perjury under the laws of the State of California that the

4   foregoing is true and correct.

5

6        Dated this 22nd day of April, 2024 in Palm Springs, California.

7

8                                                         Thomas Stefanelli, Esq.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF THOMAS STEFANELLI

# EXHIBIT "A"

3/20/23, 4:39 PM

(5,755 unread) - lawstef7771@yahoo.com - Yahoo Mail

Find messages, documents, photos or peo    Advanced ∨

← Back    ✎    ⇜    ⇨    🗄 Archive    📁 Move    🗑 Delete    🚫 Spam    •••    ▲    ▼    ✕

Subject: Re: Action: Claim of Surefile Link

Hi Tom,

I will discuss your proposal with my clients.

As an aside, I think the possibility for Surefile and Mr. Dean to find new work at KP to be relatively slim at this point. I believe his actions to withhold delivery of the patient records lacked a customer service approach. ..... I also think that your client might want to check his existing contract with KP to determine if he has any rights to publicize his work for KP. I have copied and pasted the relevant language below. I would think your client may be holding on for something that can't be achieved and passing up something of value.I will get back to you.

Cheers,
Holly

p. 4 - Agreement # PG-19120

6.10 Publicity. Supplier will not, without the prior written consent of Kaiser Permanente, use in advertising, publicity, on the internet or otherwise the names, trade names, service marks, trade dress or logo of Kaiser Permanente, the Kaiser Permanente Medical Care Program or any affiliates of these entities or refer to the existence of this Agreement in any press releases, advertising, web sites or materials distributed or made available to prospective customers or other third parties.

Stephen Dean Services Agent (KP Medical File Storage), Dean (redacted)
3-12-19
Version – 1/26/16

Inbox        5.8K
Unread
Starred
Drafts
Sent
Archive
Spam
Trash
∧ Less

Views        Hide
🖼 Photos
📄 Documents
👤 Emails to myself
📰 Subscriptions
🛍 Shopping
🧾 Receipts
✈ Travel

Folders        Show

EXHIBIT "B"

3/20/23, 5:09 PM

(5,755 unread) - lawstef7771@yahoo.com - Yahoo Mail

Find messages, documents, photos or peo    Advanced ∨

← Back  ⤺  ⤺⤺  ⤻    📥 Archive   📁 Move   🗑 Delete   🚫 Spam   •••   ∧  ∨  ✕

Tom

— On Tue, 1/11/11, Holly.B.Burke@kp.org <Holly.B.Burke@kp.org> wrote:

From: Holly.B.Burke@kp.org <Holly.B.Burke@kp.org>
Subject: Action: Claim of Surefile
To: lawstef7771@yahoo.com
Date: Tuesday, January 11, 2011, 11:46 AM

Hi Tom,

I'm back with you. OK. My client is getting a bit frustrated and losing confidence that we can do a final settlement. KP thinks that the offer of $110,000 made last year was very generous. KP has calculated the value of the total services that Surefile has claimed are yet to be paid at $58,384.12 based on industry rates for these types of services. My client is willing to extend the time period for the previous offer of $110,000 until Friday, Jan. 14th at 1:30 pm PT. I believe my client is very serious that Friday is the deadline.

I have revised the Settlement and Release Agreement to incorporate the following changes: (a) definition of "third parties" as requested by Mr. Dean; and (b) change of the Effective Date to Jan. 14, 2011. I have kept the $110,000 amount in the agreement. In addition, I have highlighted text in the confidentiality clause that may give your client comfort that he is permitted to make disclosures that are "required or compelled by law".

As I mentioned in my email last night, I believe the Publicity clause in the executed contract with Surefile restricts Surefile from using the KP name or logo without KP consent (see email below). KP does not intend to modify this requirement. If Surefile wants to use KP's name, Mr. Dean should contact Jules Parent in KP's Procurement & Supply organization, to obtain prior written consent. Mr. Dean has Jules' contact info.

Please let me know your thoughts.

Cheers,
Holly



1/1

EXHIBIT "C"

3/20/23, 5:22 PM
(5,755 unread) - lawstef7771@yahoo.com - Yahoo Mail

Find messages, documents, photos or peo    Advanced ⌄

← Back    ⤺    ⤻    ⤼    ✉ Archive    ▤ Move    🗑 Delete    ⊘ Spam    •••    ⌃    ⌄    ✕

Re: Re: Action: Claim of Surefile EXHIBIT 8    Yahoo/Inbox ☆

**My Info** Stephan Dean <surefile@msn.com>    Fri, Mar 17 at 9:07 AM ☆
To: Thomas Stefanelli

From: Thomas Stefanelli <lawstef7771@yahoo.com>
Sent: Friday, January 14, 2011 8:44 AM
To: steven dean <surefile@msn.com>
Subject: Fw: Re: Action: Claim of Surefile

--- On Thu, 1/13/11, Holly.B.Burke@kp.org <Holly.B.Burke@kp.org> wrote:

From: Holly.B.Burke@kp.org <Holly.B.Burke@kp.org>
Subject: Re: Action: Claim of Surefile
To: lawstef7771@yahoo.com
Date: Thursday, January 13, 2011, 2:47 PM

Tom,
Sounds good. I was up to my armpits yesterday with work and sent the quick
availability times. I will call try and call later this afternoon.
I had some ideas this morning while at the gym. Just a thought - what if we modified
the confidentiality clause with respect to "services" so that Dean would be precluded
from disclosing confidential or proprietary info about the services, including the name
of Kaiser Permanente. In effect, this would give Dean the right to talk to future
prospective customers about its background providing the storage services without
disclosing confidential aspects of this service or KP's name?

Just a thought.

What about third party definition? Did that work?

Talk later?

Cheers,
Holly

⌄

WINTER
CHECKLIST
✓ Hot Coats
✓ Wiper Blades
✓ Winter Tires

AMERICA'S
TIRE

SHOP NOW

EXHIBIT "D"

3/20/23, 5:13 PM                          (5,755 unread) - lawstef7771@yahoo.com - Yahoo Mail

Find messages, documents, photos or peo    Advanced ∨

← Back    ◁    ◁◁    ⇨    ▦ Archive    ▦ Move    🗑 Delete    ⊗ Spam    ● ● ●    ▲    ▽    ✕

| Inbox | 5.8K |
| Unread | |
| Starred | |
| Drafts | |
| Sent | |
| Archive | |
| Spam | |
| Trash | |
| ∧ Less | |

**From:** Holly.B.Burke@kp.org <Holly.B.Burke@kp.org>
**Subject:** Re: Action: Claim of Surefile
**To:** lawstef7771@yahoo.com
**Date:** Wednesday, January 12, 2011, 6:59 PM

Tom,

I would suggest a phone call. I'm available to chat tomorrow from 8:30 am - 9 am or from 10 - 11 am.

Please note that the no publicity clause applies across the board to all of our vendors. I believe it is enforceable as Kaiser Permanente is a protected mark. I believe KP is firmly entitled to prevent a party from using this mark and logo for commercial purposes.

Cheers,
Holly

KAISER PERMANENTE.

**HOLLY BURKE**
SENIOR COUNSEL
LEGAL DEPARTMENT

1800 HARRISON ST.
18TH FLOOR
OAKLAND, CA 94612

OFFICE – (510) 625 – 5679    TIE: 8-428-5679
FAX – (510) 625-2882
EMAIL – Holly.B.Burke@kp.org

**NOTICE TO RECIPIENT:** If you are not the intended recipient of this e-mail, you are prohibited from sharing, copying, or otherwise using or disclosing its contents. If you have received this e-mail in error, please notify the sender immediately by reply e-mail and permanently delete this e-mail and any attachments without reading, forwarding or saving them. Thank you.

**Thomas Stefanelli**                    To Holly B Burke/PO/KAIPERM@KAIPERM

🖼 Photos
📄 Documents
✉ Emails to myself
⊞ Subscriptions
🛍 Shopping
🧾 Receipts
✈ Travel

Folders    Show

EXHIBIT "E"

3/20/23, 5:29 PM                           (5,754 unread) - lawstef7771@yahoo.com - Yahoo Mail

Find messages, documents, photos or peo    Advanced ∨

← Back  ⇦  ⇧  ⇨    Archive    Move    Delete    Spam    •••    ▲  ▼  ✕

Inbox          5.8K         --- On Fri, 1/14/11, Holly.B.Burke@kp.org <Holly.B.Burke@kp.org> wrote:
Unread
Starred                      From: Holly.B.Burke@kp.org <Holly.B.Burke@kp.org>
Drafts                       Subject: Action: Claim of Surefile
                             To: lawstef7771@yahoo.com
Sent                         Date: Friday, January 14, 2011, 9:54 AM
Archive
Spam                         Tom,
Trash
                             I thought I would get you this revision before hearing your response to my email last
⌃ Less                       night. I will be in some long meetings today. Since the settlement offer expires today,
                             I thought it might be helpful to revise the draft settlement to incorporate this proposed
Views          Hide          change. I'm hoping that this response to your client's concerns will be well received.

Photos                       I have revised the Settlement Agreement to reflect my attempt to respond to
Documents                    Surefile's request that it have flexibility to talk to prospective customers about its
                             experience in providing offsite storage and deactivation services.  With the revised
Emails to myself             language - Surefile could disclose to prospective customers its services experience -
Subscriptions                although Surefile would be restricted from using Kaiser Permanente's name or
Shopping                     disclosing confidential or proprietary info regarding KP that it obtained in the course
                             of providing the services. I hope this responds and addresses Surefile's concerns.
Receipts
Travel                       Let me know if this might work. I have attached a signature ready pdf in the event
                             this v.8 is acceptable.
Folders        Show
                             Cheers,
                             Holly

                             ▒ KAISER PERMANENTE.
                             HOLLY BURKE
                             SENIOR COUNSEL
                             LEGAL DEPARTMENT

                             1800 HARRISON ST.
                             18TH FLOOR
                             OAKLAND, CA 94612

                             OFFICE – (510) 625 – 5679 TIE: 8-428-5679
                             FAX – (510) 625-2882
                             EMAIL – Holly.B.Burke@kp.org

Ameritrade*

Discover
online
commission-
free ETFs
in our
ETF Market
Center

Learn more
+ important information

EXHIBIT "F"

3/20/23, 5:37 PM

(5,750 unread) - lawstef7771@yahoo.com - Yahoo Mail

Find messages, documents, photos or peo    Advanced ⌄

← Back   ↩   ↩↩   ↪   🗄 Archive   Move   🗑 Delete   🚫 Spam   •••   ⌃   ⌄   ✕

Inbox    5.8K

Unread

Starred

Drafts

Sent

Archive

Spam

Trash

⌃ Less

Views    Hide

📷 Photos

📄 Documents

Emails to myself

Subscriptions

Shopping

Receipts

Travel

Folders    Show

Tom

--- On Tue, 3/8/11, Holly.B.Burke@kp.org <*Holly.B.Burke@kp.org*> wrote:

From: Holly.B.Burke@kp.org <Holly.B.Burke@kp.org>
Subject: Action: Claim of Surefile - Need Confirmation of Existing Situation
To: lawstef7771@yahoo.com
Date: Tuesday, March 8, 2011, 6:06 PM

Hi Tom,

I'm really sorry to hear about your Dad.

Thanks for getting back to me. I wanted to get confirmation on the current Dean offer. I want to minimize any confusion at this important point.

I wondered if you could confirm my understanding. As I understand the new offer, we have two options.

1. Option 1: $110K to settle with the previous language re: confidentiality. Please see Option 1 document, which is Version 9 (without additional confidentiality and publicity restrictions). I want to confirm if the document as marked was the acceptable version to go with Option 1. We would need to update the dates in this version.

2. Option 2: $200k with updated language re confidentiality, publicity and disparagement. Please see Option 2 document, which is Version 9 that I sent to you in mid-Jan.  We would need to update the $ amounts and dates in this version.

Option 1 Document:

Option 2 Document:

Can you let me know if this is correct?

Thanks much,
Holly

EXHIBIT 2

### SETTLEMENT AGREEMENT AND RELEASE

Stephan C. Dean and Liza Dean, doing business as Sure File Systems ("Dean" or "Sure File"), with its principal place of business at 43-915 Camp Place, Indio, California 92203, on the one hand, and Kaiser Foundation Health Plan, Inc., a California nonprofit public benefit corporation ("KFHP") and Kaiser Foundation Hospitals, a California nonprofit public benefit corporation ("KFH"), each with its principal place of business at One Kaiser Plaza, Oakland, California 94612 (collectively referred to herein as "KP"), on the other hand, hereby enter into this Settlement Agreement And Release (the "Agreement"), effective as of March 24, 2011 ("Effective Date").

### RECITALS

WHEREAS, Stephan C. Dean and Liza Dean doing business as "Sure File Systems" have rendered services to KP and its affiliates, including without limitation, the preparation, sorting, scanning, indexing, quality control, transportation and storage of patient medical records (collectively, the "Services").

WHEREAS, Sure File and KP failed to fully memorialize their business relationship relating to the Services in a written agreement;

WHEREAS, Sure File asserts that it has yet to be fully compensated for Services performed and costs incurred in providing Services to KP and has alleged other claims against KP which KP has disputed (collectively, the "Dispute"); and

WHEREAS, the parties to this Agreement now desire to settle and compromise any claims they might possess against the other, settle the Dispute and otherwise resolve any outstanding issues as more fully set forth herein.

WHEREAS, It is expressly understood by all parties that this Agreement is being entered into to avoid the costs and burdens of protracted disagreement and/or litigation and that the parties by entering into or performing this Agreement make no statement, admission, or concession concerning the viability of any claims they have asserted or may have asserted against each other.

### AGREEMENT

In consideration for the promises and performances hereafter described, the parties agree as follows:

1.    Consideration and Performance.

A.    KP has agreed to pay Stephan C. Dean dba Sure File Systems the amount of $110,000 (the "Settlement Funds"). KP will make payment of the Settlement Funds via a check in immediately available funds made payable to Stephan C. Dean dba Sure File Systems, which will be available for pickup at KP's Walnut Center, CA facility two (2) business days following execution of this Agreement by the parties. At the request of Stephan Dean, KP shall send the check to Mr. Dean via FedEx or UPS overnight mail to the address specified in writing by Mr. Dean.

Surefile Release #543885v.10                    1                    Confidential

B.    The Settlement Funds shall be in full and final settlement and compromise of any claims they might possess against the other, including without limitation the Dispute and any counterclaims and allegations related to or in connection with the Dispute for all times prior to and after the Effective Date.

C.    Except as otherwise provided herein, KP and Sure File agree that no additional money shall be due from any party, for any reason whatsoever, for any obligation incurred by any party to any other party in connection with the Dispute.

2.    Indemnification.  KP will indemnify, defend and hold harmless Sure File, Stephan C. Dean, and Liza Dean, and their agents and employees, from third party claims, demands, or causes of action for damages or loss resulting from alleged harm to or loss of the medical records previously maintained by Sure File, or resulting from Sure File, Stephan C. Dean, and Liza Dean, and their agents and employees obtaining information regarding Kaiser patients. As used herein, the "third party" means any person or entity other than a party to this Agreement and such party's affiliates, as defined in paragraph 3 below.

3.    Settlement and Releases.  Further, effective upon signature of this Agreement and delivery of the Settlement Funds, KP, on the one hand, and Sure File, Stephan C. Dean, and Liza Dean, on the other hand, shall mutually remise, release, and forever discharge each other, including any and all persons, firms, partnerships, corporations, heirs, executors, contractors, subcontractors, suppliers, administrators, and their respective predecessors, successors, assigns and shareholders, and all of their past, present and future officers, directors, partners, agents, attorneys, parent companies, subsidiaries, related entities, affiliated companies, accountants, and employees and their respective successors, heirs, assigns, executors, and administrators thereof, and/or each of the aforesaid (collectively referred to herein as "affiliates"), from all claims, actions, causes of action of any nature and for all liabilities and obligations of every kind and character arising out of or relating to the Dispute and any and all claims that were or could have been asserted relating to and/or arising from any of the foregoing, regardless of whether such claims, actions or causes of action have arisen prior to the Effective Date or arise after the Effective Date. Without limiting the scope of the foregoing, this release extends to unknown claims, meaning claims the parties may not have any basis to know or suspect at this time or at any time in the past, with respect to the Dispute, and all parties certify their intent to release such claims and obligations that relate to the Dispute notwithstanding their present lack of knowledge. Furthermore, each party confirms that it intends this Agreement to constitute a general release of all claims relating to the Dispute and each party hereby desires to and hereby does waive any rights or claims it would otherwise have under California Civil Code Section 1542, which reads as follows:

"A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."

4.    Advice of Counsel.  The parties understand and acknowledge the significance and consequences of signing this Agreement and have had a full opportunity to discuss, and/or have discussed, this Agreement with their attorneys.

5.    Warranty of Voluntary Agreement. Each party warrants and represents that this Agreement is freely and voluntarily executed by such party, after having been apprised of all of the relevant information and data by its attorneys. Each party executing this Agreement warrants and represents that it has not relied on any inducements, promises or representations made by any party or its representative, or any other person, except for those expressly set forth herein.

6.    Warranty of Mutual Understanding. The parties hereto warrant and represent that they have read this Agreement and that they have had a full opportunity to have, and/or have had, the terms used herein and the consequences hereof explained to them by their respective attorneys; that each is legally competent to execute this Agreement and accept full responsibility therefor; and has the authority to do so. It is expressly understood by the parties, and each of them, by reason of the consideration hereinabove mentioned, that the parties admit no liability of any sort and have made no representations as to any liabilities or obligations and have made no agreements or promises to do or admit to do any act or thing not set forth herein.

7.    Warranty of Performance. Each party hereto agrees to promptly carry out and execute its responsibilities under the terms of this Agreement and to execute any and all documents which may be necessary from time to time in the future to implement the terms of this Agreement.

8.    Warranty of Right and Authority. The parties each warrant no other person or entity has or had or claims to have had any interest in the claims, demands, causes of action, obligations, damages or liabilities described herein; that he, she or it has not pledged, sold, assigned, transferred, conveyed, or otherwise disposed of any claim, demand, cause of action, obligation, damage or liability covered herein. The parties further warrant that the person(s) signing on their behalf is (are) duly authorized by appropriate corporate or other action to sign the agreement and bind their respective entities to it. Any breach of these warranties, or any of them, shall render the breaching party (ies) liable for any damages caused by the breach, including reasonable attorneys' fees expended as a result of the breach.

9.    Binding Effect. This Agreement shall bind and inure to the benefit of all successors, assigns, spouses, children, and heirs of the parties. Should any party cease to exist during the period of performance of this Agreement, the rights, duties, and obligations of the deceased party shall inure and bind its successors, assigns, and heirs.

10.    Incorporation of Recitals. The Recitals set forth at the beginning of this Agreement are affirmed by the parties hereto, and are acknowledged by the parties to be true and correct and are hereby incorporated into the body of this Agreement as if fully set forth herein.

11.    Modification Must Be In Writing. This Agreement may not be altered, amended, or modified, except in a writing that is executed by duly authorized representatives of all of the parties hereto.

12.    Construction. Should any paragraph, clause or provision of this Agreement be construed to be against public policy or determined by a court of competent jurisdiction to be void, invalid or unenforceable, such construction and decision shall affect only those

13.    Non-Disclosure. The nature and terms of this Agreement shall not be disclosed by any party hereto or its agents, attorneys, or any other representative, without the prior written consent of all of the other parties; provided, however, that any party may disclose the existence of this Agreement, and the nature and terms thereof, (i) to the attorneys, accountants, and financial and tax advisors of that party, (ii) as required or compelled by law, or (iii) to enforce the provisions of this Agreement. KP and Dean will continue take appropriate steps to preserve all confidential information in the medical records handled by Dean during the course of providing Services as required by the Confidentiality of Medical Records Act, Cal. Civ. Code § 56 et seq., the federal Health Insurance Portability and Accountability Act ("HIPAA"), and the parties' Business Associate Agreement of June 24, 2009.

14.    Governing Law. This Agreement shall be construed and governed by the laws of the State of California.

15.    Notices. Notices under this Agreement shall all be in writing, effective upon receipt and shall be sent by any of the following methods (a) facsimile with return facsimile acknowledging receipt; (b) United States Postal Service certified or registered mail with return receipt showing receipt; or (c) courier delivery service with proof of delivery; or (d) personal delivery. Either party hereunder may change the names and addresses for receipt of notices by notice given as provided for herein.

Notices to Sure File shall be sent as follows:

Stephan C. Dean,
dba Sure File Systems
43-915 Camp Place
Indio, California 92203
With a copy to:

Notices to KFHP or KFH shall be sent as follows:

Kaiser Foundation Health Plan, Inc.
Kaiser Foundation Hospitals
393 E. Walnut Street, 5th floor, (53R03)
Pasadena, CA 91188
Attn: Laurel Junk, VP Supply Chain

With a copy to:
Kaiser Foundation Health Plan, Inc.
1800 Harrison St, 8th Floor
Oakland, CA 94612
Attn: Holly Burke, Senior Counsel

16.    Subject Headings.  Subject headings used in this Agreement are for convenience only. The singular shall include the plural and the masculine shall include the feminine and neuter genders.

17.    Counterparts.  This Agreement may be executed in any number of counterparts and each counterpart signature shall, when taken with all other signatures, be treated as if executed upon one original of this Agreement.  A facsimile signature of any party shall be binding upon that party as if it were an original.

18.    Entire Agreement.  This Agreement states the entire agreement among the parties who have executed this Agreement and supersedes their prior agreements, negotiations or understandings.  Each of these parties acknowledges and agrees that no other party, nor agent, nor attorney of any of the parties made any promise, representation or warranty, express or implied, not set forth in this Agreement.  Each party signing this Agreement acknowledges that such party has not executed this Agreement on reliance on any promise, representation, conduct or warranty of any other party not expressly set forth in this Agreement.

         IT IS SO AGREED.


Dated: March ___, 2011              Stephan C. Dean, dba Sure File Systems


                                    By:_____
                                    PRINT NAME:_____

                                    LIZA DEAN

Dated: March ___, 2011
                                    By:_____
                                    PRINT NAME:_____


Dated: March 24, 2011               KAISER FOUNDATION HEALTH PLAN, INC.
                                    KAISER FOUNDATION HOSPITALS

                                    By:_____
                                    PRINT NAME: Laurel L. Junk
                                    TITLE: Vice President, Supply Chain


Surefile Release #543885v.10              5                    Confidential

# EXHIBIT 3

SUPERIOR COURT - STATE OF CALIFORNIA

COUNTY OF RIVERSIDE

KAISER FOUNDATION HEALTH PLAN, INC.,  )
and KAISER FOUNDATION HOSPITALS,      )
                                      )
                    Plaintiffs,       )
                                      )
         vs.                          ) Case No. INC1207224
                                      )
STEPHAN CHRISTOPHER DEAN, LIZA        )
DEAN, DBA SUREFILE FILING SYSTEMS,    )
and DOES 1-10, Inclusive,             )
                                      )
                    Defendants.       )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

HEARING RE MOTION FOR SUMMARY JUDGMENT

BEFORE THE HONORABLE DAVID M. CHAPMAN

July 31, 2013

APPEARANCES:

For the Plaintiffs:          THOMAS M. FREEMAN
                             MARION'S INN LLP
                             1611 Telegraph Avenue, Suite 707
                             Oakland, California  94612-2145


For the Defendants:          STEPHAN CHRISTOPHER DEAN
                             LIZA DEAN
                             In Propria Persona
                             44700 Ronald Street
                             Indio, California  92201


Reported By:                 TERRI L. DICKNEIDER, CSR NO. 5031

**CERTIFIED COPY**

TERRI L. DICKNEIDER, CSR

1        PALM SPRINGS, CALIFORNIA; JULY 31, 2013

2          BEFORE THE HONORABLE DAVID M. CHAPMAN

3          THE COURT:  Next, calling the matter of Kaiser

4  Foundation versus Dean.  Thank you for your patience this

5  morning, Counsel.

6          MR. FREEMAN:  Thank you for hearing us, Your Honor.

7          THE COURT:  My pleasure.  Could we have your

8  appearances for the record?

9          MR. FREEMAN:  Thomas Freeman for plaintiff, Kaiser

10  Foundation Health Plan, and opposing party.

11          MR. DEAN:  Good morning, Your Honor.  Stephan Dean,

12  defendant.

13          MS. DEAN:  Good morning, Your Honor.  Liza Dean,

14  defendant.

15          THE COURT:  Won't you please make yourselves

16  comfortable.  Please have a seat.

17          This matter is here for a motion for summary judgment.

18  The court issued its tentative ruling yesterday.  That was

19  posted.  Mr. Freeman, on behalf of Kaiser, has requested oral

20  argument.

21          And, as you can see, I spent a good deal of time

22  wrestling with these issues, and I must tell you that this was

23  not an easy call.  And a large part of the court's tentative

24  ruling -- and I underscore that that is only a tentative

25  ruling -- was based upon the four corners of plaintiffs'

26  complaint, particularly in -- I believe it was paragraph 16 of

27  the complaint, in which there were allegations raised

28  specifically providing that following the execution of the

1  Surefile Transfer Agreement in March of 2011, the defendants and

2  plaintiffs negotiated a confidential settlement agreement to

3  resolve all of the outstanding issues between them.  And there

4  was an offer at that time for -- from the plaintiffs to make

5  that settlement agreement available to the court, although the

6  court has read and reviewed that settlement agreement in that it

7  was an exhibit to the moving papers.

8          So with that foundation, Mr. Freeman, you are free to

9  make any comments or arguments that you would like.

10          MR. FREEMAN:  Yes, Your Honor.  The -- I appreciate the

11  court taking the time to review the plaintiffs' motion and the

12  papers submitted in opposition, and it's clear from the

13  tentative that the court did spend a considerable amount of time

14  looking at the matter.  However, I want to raise three issues

15  regarding the tentative, Your Honor, to address some facts which

16  the court may have overlooked or perhaps misconstrued, because

17  the relationship between the parties and the -- that led up to

18  the settlement agreement, and certainly the intent of Kaiser in

19  executing that settlement agreement, need to be clearly

20  understood.

21          Second --

22          THE COURT:  Okay.  I want to make sure I get the

23  issues.  One is the intent.

24          MR. FREEMAN:  Correct.

25          THE COURT:  Okay.

26          MR. FREEMAN:  And I'm going to -- I'm going to return

27  to the facts leading up to the execution of that agreement and

28  why we believe it should not be construed in the manner urged by

1   defendants and reflected in the tentative.

2          The second issue that I want to at least raise, because
3   it is not specifically addressed in the tentative, is that there
4   are in the plaintiffs' complaint four causes of action.  The
5   first is for breach of contract.  There are three other causes
6   of action.

7          THE COURT:  May I stop you right there?

8          MR. FREEMAN:  Yes.

9          THE COURT:  Was it your intent in your breach of
10  contract action to allege and/or plead a cause of action
11  claiming that there was a breach of the settlement agreement as
12  opposed to a breach of the business associate agreement?

13         MR. FREEMAN:  No.

14         THE COURT:  Thank you.

15         MR. FREEMAN:  Amongst the other causes of action
16  alleged, there are two common counts which are not addressed
17  with any specificity by the plaintiffs' moving papers, other
18  than their argument that all causes of action are subsumed by
19  the settlement agreement.  I'll address that in more detail in a
20  moment.

21         The third cause -- the third issue that I want to
22  raise, which is one that is -- is in fact raised by the
23  tentative, is a request by plaintiff for leave to amend its
24  complaint to allege alternative theories of mistake of fact or
25  concealment of material facts which induced Kaiser to enter into
26  the settlement agreement.  If in fact -- and I'll address that.
27  I hope to turn you around --

28         THE COURT:  That's a fallback position.

 1          MR. FREEMAN:  That is the fallback position.  But as

 2     the court -- the court cited in its tentative the *Laabs*

 3     decision, at 163 Cal.App.4th 1242.  And at page 1248 of that

 4     decision, the court cites the *Kirby versus Albert D. Seeno*

 5     *Construction Company* case, which makes the point and the holding

 6     in -- in the *Kirby* case is that on a motion for summary

 7     judgment, if the plaintiff wishes to expand the issues

 8     presented, we may and must at this hearing request leave to

 9     amend.

10          THE COURT:  Okay.

11          MR. FREEMAN:  So I don't want there to be any ambiguity

12     about the fact that we -- if the court stands by its

13     interpretation of the settlement agreement as subsuming the

14     allegations alleged, we seek leave to amend to allege either

15     mistake of fact or concealment of material facts, a fraud claim.

16          THE COURT:  But not leave to amend on an allegation of

17     a breach of the settlement agreement?

18          MR. FREEMAN:  Well, it may be with respect to the

19     settlement agreement, Your Honor.

20          THE COURT:  Okay.

21          MR. FREEMAN:  And I'll circle back to that in a moment,

22     because as -- if you look at the declaration of Ms. Burke, she

23     really recites both the facts as Kaiser understood them in

24     entering into the settlement agreement because she is the party

25     who negotiated it with -- with the Deans' counsel --

26          THE COURT:  Would you bear with me?

27          MR. FREEMAN:  Sure.

28          THE COURT:  Please forgive me.  I want to go get

1  another -- I thought I brought them out with me.  But I have got
2  another note regarding Ms. Burke's declaration.  If you will
3  bear with me, I'll be right back.

4      MR. FREEMAN:  Sure.

5      (Pause.)

6      THE COURT:  Thank you.  You may proceed, sir.

7      MR. FREEMAN:  Okay.  The -- I think if -- if I turn to
8  Ms. Burke's declaration, I can provide the factual background
9  and predicate to what Kaiser believes is a reasonable
10  interpretation of the settlement agreement consistent with the
11  allegations in plaintiffs' complaint.  The Deans had a
12  relationship with Kaiser whereby they provided services for a
13  number of years, beginning directly in 19- -- in 2008.  Some of
14  the services provided by the Deans were documented by written
15  agreements.  Other -- including invoices for payment.  Some of
16  the services were documented by services agreements, more
17  complete agreements, which both parties executed.  Some of the
18  services were not reflected in written agreements.  The Deans
19  rendered the services.

20      What is important to understand is that the services
21  that the Deans rendered beginning in late 2008, continuing into
22  2009, first and foremost involved the transfer of physical
23  medical record folder files from the Moreno Valley Community
24  Hospital, which Kaiser had acquired.  Those records at the time
25  Kaiser acquired the hospital were stored in a trailer out in
26  back of the hospital, in a very insecure situation.  Kaiser
27  didn't have the ability or facilities to store those records.
28  They needed to catalog the records before they were taken

1   offline by Moreno Valley Hospital.  And so the Deans were

2   retained to catalog those records, and they initially did that

3   work on site, but then transported the records to their facility

4   in Indio, where basically they cataloged the records with the

5   name of the patient, the medical record number, date of birth,

6   date of service, sometimes the Social Security number, although

7   that was rare.  So -- and then it was contemplated those records

8   would be returned to Kaiser; however, there was delay in doing

9   that.

10        The Deans continued to provide other services to

11  Kaiser, including the West L.A. deactivation project in early --

12  late 2009, early 2010.  And those were records, again, which

13  were being cataloged so that the physical files could be put

14  into permanent storage.

15        During the course of providing those services, the

16  Deans delivered to Kaiser CDs with the cataloging of those

17  records.  Some of the records were taken off -- taken off site

18  from the Deans and returned to Kaiser and put into storage.

19  Others remained there in storage in their warehouse.

20        After the completion of the deactivation project for

21  West L.A, there was a dispute that arose between the Deans and

22  Kaiser over the compensation that the Deans were entitled to.

23  That dispute culminated in the summer of 2010 in Kaiser formally

24  terminating its agreements with the Deans, the West L.A.

25  agreement and a November 2009 agreement, and the preparation of

26  the transfer agreement.  The intent of the transfer agreement,

27  which Ms. Burke describes in her declaration and which she

28  helped shepherd through, was intended to facilitate the return

1  to Kaiser of these medical record folders which were in this

2  warehouse in Indio.

3       There was no understanding at that time on Kaiser's

4  part that the Deans, in addition to those records, had on their

5  computers records of e-mails exchanged between an employee at

6  Kaiser and the Deans regarding any of those medical records.  We

7  now know, we now have learned since the execution of the

8  settlement agreement, that during the time the Deans had these

9  medical records in their custody, they periodically received

10  requests from Kaiser for the return of the files.

11       Kaiser knew that was happening because Kaiser would

12  receive a subpoena from somebody saying, "Hey, we need the

13  medical records of John Smith."  Kaiser would look in its files,

14  it wouldn't have it, they would call up the Deans, "Hey, we need

15  the folder for John Smith in response to the subpoena," and the

16  file would be returned to Kaiser, or somebody from Kaiser would

17  pick it up; or a patient would come in for treatment, and the

18  medical record folder would have to be retrieved.

19       So those -- periodically there were these requests

20  transmitted to the Deans for the return of these medical record

21  folders.  However, what was unknown to Kaiser and only came to

22  light in August of 2011, when Mr. Dean provided me with copies

23  of three e-mails, was the fact that at least one employee -- I

24  don't know if there are more.  The Deans have since told us they

25  have destroyed all the PHIs, so they don't have any record, but

26  we know there were at least three e-mails that were sent to the

27  Deans by a Kaiser employee that listed confidential personal

28  health information, unencrypted.

1         That was done contrary to Kaiser's policies and

2    procedures, contrary to the training that Kaiser employees

3    received, and there would have been no reason for Kaiser to know

4    or believe that such a communication had in fact occurred, nor

5    that the Deans had retained those e-mails with the personal

6    health information, which included dates of birth, Social

7    Security numbers, medical record numbers, at the time either the

8    transfer agreement was entered into in June or July of 2011, nor

9    at the time of the settlement agreement.

10         So what I -- and that's -- there is no dispute about

11    that from the Deans in terms of their disclosure of it, Kaiser's

12    knowledge of it.  It was never communicated.  The transfer

13    agreement by its terms refers only to the return of the medical

14    records.

15         And -- and in addition to that, and this leads to the

16    settlement agreement, at the time that the transfer agreement

17    was undertaken, Kaiser agreed to make a down payment, so to

18    speak, to the Deans for the services that they have rendered.

19    But it was specifically acknowledged in the transfer agreement,

20    in paragraph 4, that Dean reserves the right to pursue Kaiser

21    for cost of storage, maintenance, and delivery of the Moreno

22    Valley, Riverside County, records.

23         So it was understood there would be a further

24    negotiation and reconciliation of that claim.  That's what the

25    settlement agreement was intended to do.

26         THE COURT:  But it's not what it says.

27         MR. FREEMAN:  Well, it is, in that -- and this is where

28    I would, I guess, take issue with the court's interpretation --

1          THE COURT:  Did it define the dispute?

2          MR. FREEMAN:  It does.

3          THE COURT:  And would you read that to the court, and

4   for the record, as to how it defines the dispute.

5          MR. FREEMAN:  So in the recitals, it says:  "Whereas,

6   Surefile asserts that it has yet to be fully compensated for

7   services performed and costs incurred in providing services to

8   KP, and has alleged other claims against KP -- "

9          THE COURT:  Stop right there.  "Other claims against

10  KP."  Do they identify what those other claims are?

11         MR. FREEMAN:  They do not define them in the settlement

12  agreement.

13         THE COURT:  And in addition to the dispute that you

14  identified in that language, the settlement agreement goes on to

15  purport to settle any and all claims that one has against the

16  other, both past, present, and future.  In fact, known and

17  unknown claims.

18         MR. FREEMAN:  It does.  And -- and I'll concede that

19  perhaps some of that language is not as precise, which we would

20  now hope it would have been.  But in references to the release,

21  well, in -- in -- in references to the dispute, in the agreement

22  portion of the settlement agreement, in paragraphs B and C, all

23  of the references are with respect to the dispute.  And

24  paragraph B, for example, says:  "The settlement funds shall be

25  in full and final settlement and compromise of any claims they

26  might possess against the other, including without limitation

27  the dispute and any counterclaims and allegations related to or

28  in connection with the dispute at all times prior to and after

1    the effective date."

2         Paragraph C also says:  "Except as otherwise provided
3    herein, KP and Surefile agree that no additional money shall be
4    due from any party, for any reason whatsoever, for any
5    obligation incurred by any party to any other party in
6    connection with the dispute."  "The dispute" being Deans' claims
7    for compensation as reflected in the transfer agreement.

8         THE COURT:  And if the language within that release
9    only said "the dispute," then I think that gives you more solid
10   foundation for your argument.  But the settlement agreement then
11   goes on much more than just settling the dispute.  It purports
12   to not only settle the dispute, but "any and all claims," past,
13   present or future, known or unknown.  And there is a waiver of
14   the Civil Code section.  Is there not?

15        MR. FREEMAN:  There -- there is a -- a waiver of 1542.
16   However, in the settlement paragraph, settlement and release
17   paragraph number 3, again, all of the references to the release
18   are keyed off of liabilities and obligations, liabilities and
19   obligations arising out of or relating to the dispute.

20        THE COURT:  Then why do you --

21        MR. FREEMAN:  That point is made four times in that
22   paragraph, where it says "with respect to the dispute," "that
23   relate to the dispute," "relating to the dispute."

24        THE COURT:  Then why do you include language in your
25   release -- if you did not intend to release all other claims,
26   why is that language within the release?  If you only intended
27   to settle, to use your words, "the dispute," why did you include
28   in your release a release of all other claims, known or unknown?

1  Why is that language there if it doesn't purport to do exactly
2  what it says?

3      MR. FREEMAN:  Because it was within the contemplation
4  of the parties at the time that the claims that were being
5  released all related to Deans' claims for compensation for
6  services rendered with respect to his handling of records for
7  Kaiser.

8      THE COURT:  But you concede, do you not, that your
9  release that you drafted does not purport to limit the release
10  in exchange for just "the dispute," as you have defined it,
11  relating to compensation.  That's not what the document says.

12      MR. FREEMAN:  It does include those other words.

13      THE COURT:  It does.  And so -- but there is a
14  paragraph in the release that has to do with the business
15  association agreement, and I believe you might want to check
16  around paragraph 7, where it talks about preserving the
17  confidentiality.  And it makes specific reference to the
18  business association agreement, does it not?

19      MR. FREEMAN:  It does.  In paragraph 13.

20      THE COURT:  Paragraph 13.  And what does it say about
21  the business association agreement in paragraph 13 of the
22  release agreement?  Because in your opposition to this motion,
23  you assert that the business association agreement survived this
24  settlement agreement of all other claims, known and unknown.
25  Correct?

26      MR. FREEMAN:  Correct.

27      THE COURT:  Now, in reading that paragraph, what does
28  it say about specifically the business association agreement?

1  Does it say all terms and conditions of the business association

2  agreement are preserved and survive this purported settlement,

3  or does it attempt to carve out only a portion of the business

4  association agreement as it related to the subject of

5  confidentiality?

6          MR. FREEMAN:  Well, I will tell you that Ms. Burke

7  understood that the settlement agreement did not and was not

8  intended to supersede the BAA.

9          THE COURT:  I read her declaration, but what does your

10  settlement agreement say --

11          MR. FREEMAN:  The --

12          THE COURT:  -- as it relates to the BAA?

13          MR. FREEMAN:  Paragraph 13, I'll read the whole thing.

14          THE COURT:  Thank you.  Slowly for my -- for my court

15  reporter, please.

16          MR. FREEMAN:  Sure.  And if I read it too fast at any

17  point, she should stop me.

18          THE REPORTER:  Thank you.

19          MR. FREEMAN:  Paragraph 13, which is headed

20  "Non-disclosure," states:  "The nature and terms of this

21  agreement shall not be disclosed by any party hereto or its

22  agents, attorneys, or other representative, without the prior

23  written consent of the other parties, semicolon, provided,

24  however, that any party may disclose the existence of this

25  agreement, and the nature and terms thereof, subparagraph little

26  i, to the attorneys, accountants, and financial and tax advisors

27  of that party, sub double little i, as required or compelled by

28  law, or sub three little i, to enforce the provisions of this

1  agreement.  Period.  KP and Dean will continue to take
2  appropriate steps to preserve all confidential information in
3  the medical records handled by Dean during the course of
4  providing services as required by the Confidentiality of Medical
5  Records Act, Cal. Civil Code section 56, et seq., the federal
6  Health Insurance Portability and Accountability Act, paren,
7  HIPAA, H-I-P-A-A, close paren, and the parties' business
8  associate agreement of June 24, 2009."

9  THE COURT:  Okay.  So, now, my question to you:  In the
10  settlement agreement, contrary to Ms. Burke's understanding as
11  set forth in her declaration, is it your position that the
12  language that you have just quoted in fact allows full and
13  complete enforcement of the BAA, or does that portion of the
14  settlement agreement carve out only a portion of the obligations
15  under the BAA, to wit, protect the confidentiality of those
16  records?

17  And the reason that becomes important is, under the
18  BAA, specifically paragraph 2.8 of the business association
19  agreement, there is an obligation on behalf of the Deans to make
20  the protected information in the designated records available to
21  KP for inspection within ten days.  The question for the court,
22  then, is:  Does paragraph 2.8 of the BAA survive the global
23  settlement agreement?  And, if so, then the Deans have an
24  obligation upon ten days -- or they have the obligation to make
25  available for inspection within ten days the protected health
26  information.

27  So my question to you is:  Do you believe that
28  paragraph in the settlement agreement, in fact, exempts and

1  provides that the entire BAA survives, or is it only a portion

2  of the BAA that survives relating to the confidentiality of the

3  protected health information?

4        MR. FREEMAN:  Paragraph 13, I believe, Your Honor,

5  based on the terms that we are talking about here, I think

6  certainly reflects an intent for this specific provision of

7  access in the BAA to survive.  No question.

8        THE COURT:  The -- no question, the issue as -- at

9  least in this court's opinion, that paragraph of the settlement

10  agreement absolutely provides that the confidentiality aspects

11  of the business associate agreement survives the settlement

12  agreement.  And so my question for you -- and, more importantly,

13  it may not be you, but was it Ms. Burke who drafted the

14  settlement agreement? -- if it was her intent that the entire

15  business association agreement, all terms and conditions and

16  obligations thereunder, be exempt from the settlement agreement,

17  why didn't she say so?

18        It would have been very easy for her to say in that

19  settlement agreement not that just the confidentiality under the

20  BAA would survive, although she doesn't use the word "survive,"

21  but I -- I adopt your argument that it was her intent.  Why

22  wouldn't she have said not only the confidentiality sections of

23  the BAA survive, but all obligations contained within the BAA

24  and that entire agreement survives what purports to be the

25  global settlement in which she said, "I am giving up, the Deans

26  are giving up, and both sides are mutually agreeing that all

27  claims, past, present, future, known or unknown, except

28  paragraph 13, is being settled in exchange for that $100,000" or

1  whatever that figure was that was part of the settlement

2  agreement?

3          MR. FREEMAN:  The answer is because she was acting

4  under a mistake of fact.  She understood that at the time this

5  agreement was entered into, the settlement agreement, that the

6  Deans had in fact, pursuant to the transfer agreement, returned

7  to Kaiser all of the records that they had in their possession.

8  There was no inkling on anybody's part at Kaiser that the Deans

9  were still in possession of electronic medical records.

10         THE COURT:  And what -- what impact do you think

11  Mr. Dean's letter has on that position, when he said

12  essentially, "I agree that the settlement agreement only had to

13  do with compensation and nothing else"?

14         MR. FREEMAN:  I think it's an admission that -- that he

15  didn't -- that he had withheld that information, that the BAA

16  was still applicable and that he was obligated by it to provide

17  that information to Kaiser.  If Kaiser had been aware at the

18  time of the settlement agreement or after the transfer

19  agreement, if it had learned from Mr. Dean, as it did a year

20  later, "Hey, I have got medical -- I have got these e-mails, and

21  I want you to pay me more money for them before I give them

22  back," if that issue had been raised, there is no question that

23  Ms. Burke would not have released the Deans from the BAA.

24         Under the terms of the BAA, it's clearly -- it was

25  clearly intent -- clearly the intent of the parties that that --

26  that the obligations of the Deans under the BAA would survive,

27  even the termination of their business relationship.  In

28  paragraph 4.4 of the BAA, it says the obligations of the

1  business associate, that is the Deans, under this article 4,
2  shall survive the termination of the business relationship
3  between the parties and/or the BAA.
4          Under the BAA, in paragraph 4.3, "Effects of
5  Termination:  Upon termination of the business relationship,
6  business associates shall, at Kaiser's direction, return or
7  destroy all protected information that the business association
8  or its agents still maintain in any form and shall retain no
9  copies of such business -- of such protected information."
10         THE COURT:  I agree.  If you were here, if this was
11 a -- if this was a lawsuit about whether they breached the BAA,
12 I think so far there is evidence that has been submitted, both
13 in support of and in opposition to the Deans' motion for summary
14 judgment, that suggests that they may have breached that
15 agreement by maintaining information that they did not have a
16 right to continue to possess.  But that's not what we are here
17 about today.
18         The question becomes:  Did Kaiser give up all of those
19 rights that they otherwise may have had to assert a breach of
20 the BAA by entering into a settlement agreement which purports
21 to give up all claims, past, present, and future, with the
22 exception of what is carved out under paragraph 13 of the
23 settlement agreement?
24         And the next question that is unanswered is:  Does
25 Kaiser have a right to assert, does Kaiser have a right to
26 assert, under paragraph 13 of the settlement agreement, a
27 violation of HIPAA on behalf of their clients?  Or former
28 patients.  Not clients, but patients.

1          MR. FREEMAN:  Well, that certainly is what Kaiser is
2    trying to do here.  That's the whole genesis of this dispute,
3    is --
4          THE COURT:  But that wasn't an allegation within your
5    complaint.  Was it?
6          MR. FREEMAN:  It was not.  But it can be easily
7    remedied if we are given leave to amend.
8          THE COURT:  Okay, but I --
9          MR. FREEMAN:  And we request that.
10         THE COURT:  But I don't want to usurp the three issues
11   that you wanted to address, and one is intent.
12         MR. FREEMAN:  Right.  But let me just make one other
13   point on that.  And it is to point out that I think there is --
14   that the Deans themselves have admitted that their obligations
15   under the BAA survived.  In Mr. Dean's letter to me of
16   August 8th, 2011, which is exhibit L, he says, "This letter is
17   to confirm that your files, in compliance with the three
18   agreements mentioned in your letter" -- that is my letter to
19   him -- "the BAA dated June 24th, 2009, the transfer agreement of
20   July 2010, and the settlement agreement dated March 24, 2011."
21         So we --
22         THE COURT:  I'm sorry.  I apologize.
23         MR. FREEMAN:  No, that's all right.
24         THE COURT:  I'm trying to get this thing so I can read
25   it.  Go right ahead.
26         MR. FREEMAN:  My point is that Mr. Dean, we would
27   contend, understood that he was obligated under the -- that the
28   BAA survive.  That it was not, as he now argues, terminated by

TERRI L. DICKNEIDER, CSR                              17

1   the settlement agreement.

2   　　　　MR. DEAN: Your Honor, I -- I have heard him. We have

3   something to say.

4   　　　　THE COURT: You will get a chance in a minute.

5   　　　　MR. DEAN: Oh, I'm sorry. Sure.

6   　　　　THE COURT: Please continue.

7   　　　　MR. FREEMAN: Let me just briefly finish, then, Your

8   Honor, because I think I have actually made my other two points.

9   　　　　The -- the common counts for claim and delivery and

10  conversion and trespass with respect to the records, we -- we

11  think arose after the agreement, after Kaiser learned that Dean

12  retained possession of the electronic medical records. The

13  e-mails that had the PHI, that -- there is no question those

14  records were Kaiser's property. Kaiser was entitled to the

15  return of them, separate and apart from the BAA, separate and

16  apart from any of the other agreements Kaiser had. The

17  essential point is that the Deans had no right to retain those

18  records. And when Kaiser asked that they be returned, the Deans

19  refused without payment of additional compensation for those

20  records.

21  　　　　And then the third point, Your Honor, is if the court,

22  as we have discussed, is going to adopt its tentative relative

23  to the interpretation of the settlement agreement and its

24  effect, then we would request leave to amend the complaint to

25  seek enforcement of the terms of the settlement agreement and

26  specifically the obligations under the BAA for the Deans to

27  provide access to those records and their breach of that

28  provision by their failure to do so, as well as alternative

1  theories based on mistake of fact and concealment of material

2  facts at the time the settlement agreement was entered into.

3          THE COURT:  Thank you.  Kaiser's -- Kaiser's request

4  for judicial notice and opposition to the defendant's motion for

5  summary judgment is granted.  And we are going to take a morning

6  break.  We will stand in recess of 15 minutes, and then the

7  Deans will have a chance to respond.

8          MR. FREEMAN:  Thank you, Your Honor.

9                          (Recess.)

10         THE COURT:  Back on the record in the matter of Kaiser

11  versus Dean.

12         Mr. Dean, you may proceed, sir.

13         MR. DEAN:  Yes, Your Honor.  Thank you for taking the

14  time to look into this.  We really appreciate it.

15         We agree with your tentative ruling.  Mr. Freeman has

16  brought out a point that allegedly Kaiser's counsel at that

17  time, Holly Burke, claims that she was unaware that we still

18  were retaining PHI in our custody or control.  At the time that

19  this agreement was drafted, I was represented by counsel, Tom

20  Stefanelli.  Mr. Stefanelli clearly told me that this agreement

21  released all claims and causes of action, not just related to

22  the dispute, but to any claims involving our business

23  relationship as defined in the recitals of the settlement

24  agreement.

25         THE COURT:  Why did you send a written notification

26  after the date of the settlement in which you asserted that the

27  settlement only resolved issues regarding compensation?

28         MR. DEAN:  Because there were other issues that were

1  involved.  One was the reporting of the HIPAA violations, and

2  the state violations of confidentiality.  And I contacted Holly

3  Burke in August of 2011, and that's what I called her about.  I

4  also at that time, a little over two years ago now, contacted

5  the California Department of Public Health and notified them of

6  the situation that we had this PHI and that we were keeping it

7  as evidence, and they were well aware of that and the reasons

8  why we had it.  There was no doubt that we had the stuff.

9       I -- I feel that this agreement that we have, this

10  settlement agreement, was very clear that it only pertained to

11  us not -- one, not disclosing it to unauthorized third parties;

12  and, two, to protect it.  But the protections in this agreement

13  are more than just the BAA.  If you look at paragraph 13, it

14  required us to also --

15       THE COURT:  Let me -- excuse me.  I apologize.  I want

16  to make sure -- I want to get to paragraph 13, if you can just

17  bear with me.

18       MR. DEAN:  Yes.

19       THE COURT:  Okay.  I'm there.

20       MR. DEAN:  Okay.  Here, I'm just going to read from the

21  part and -- part of this paragraph 13.  Under "Non-disclosure,"

22  it starts at the word "KP."  It says:  "KP and Dean will

23  continue" -- and they left the word "to" out of there, but I'm

24  sure that's what everybody meant -- "to take appropriate

25  steps" -- first of all, "to preserve," which my definition of

26  that is to maintain or retain.  And then it says, "all

27  confidential information in the medical records" -- now, that

28  was referring to patient health information -- "handled by Dean

1  in the course of providing services" -- now, the "services" is
2  described in the recitals, of all the things that we were doing
3  with the medical records and the patient information, and all
4  that was part of our business relationship as described in the
5  recitals.
6      Then it continues on to say "as required by." Now,
7  first, "Confidentiality of Medical Records Act, Civil Code 56,"
8  Civil Code 56 is -- really deals with who you can disclose
9  patient information to without a written authorization. It's
10 very, very concise. Then it goes on to say "the Federal Health
11 Insurance Portability and Accountability Act." That's HIPAA.
12 HIPAA also defines who you can disclose it to, but also the
13 protections that are required and how you are supposed to
14 preserve it.
15      Then, the third thing is "the parties' business
16 associate agreement." Now, counsel has said "business associate
17 agreement," "business associate agreement." They keep referring
18 to that. There is more to this than that. This clearly shows
19 that the -- the reason why this is in here is that we were to
20 continue to protect it and preserve it and keep it confidential.
21      Our feeling is this agreement, we are married. And
22 it's binding. And we both agree, per the March 2011 settlement
23 agreement, paragraph 18, it says: "This agreement states the
24 entire agreement among the parties who have executed this
25 agreement and supersedes their prior agreements, negotiations or
26 understandings." So our feeling was that this controls. The
27 BAA was incorporated into the agreement as well as the CMIA and
28 HIPAA, to require us to protect it and not disclose it unless it

1  was disclosed to an authorized third party or we had a patient's
2  written authorization.

3       The settlement agreement, the first page of it, under
4  "Recitals," this is very important, it says: "Whereas, Surefile
5  and KP failed to fully memorialize their business relationship
6  relating to the services in a written agreement."  This
7  settlement and release agreement was what we were to follow.  It
8  is the agreement that we are bound by now, and we have followed
9  the instructions of the agreement.

10      We were represented by counsel, as well as Kaiser's own
11  in-house counsel, Holly Burke, drafted this agreement.  These
12  were two licensed attorneys that knew exactly what they were
13  doing.  I was told very clearly that this agreement is what
14  binds us together, and the literal words of the agreement
15  require us to preserve the information that we retain or got
16  during services.  We were to follow the status quo from when we
17  have signed the transfer agreement in 2010.  And that's exactly
18  what the words say.

19      I'm done, sir.

20      THE COURT:  Thanks.  I have a question for you.  You
21  filed a declaration indicating that you had destroyed all of the
22  personal information.  Correct?

23      MR. DEAN:  Yes, Your Honor.

24      THE COURT:  What is it that you are preserving, then?

25      MR. DEAN:  Now?

26      THE COURT:  Yes.

27      MR. DEAN:  Nothing.  That's -- I don't have anything.

28      THE COURT:  Okay.  Let's -- okay.

1          MR. DEAN:  I'm sorry.

2          THE COURT:  Mr. Freeman.  What is it that you want from

3    these folks?

4          MR. FREEMAN:  We want an entry of a permanent

5    injunction that would prevent them from maintaining or using any

6    personal health information.  If they have nothing, then the

7    permanent injunction would just assure that nothing was ever

8    used.

9          THE COURT:  Wasn't there an injunction that was issued

10   in this case by my predecessor, and is that still in effect?

11         MR. FREEMAN:  It is.

12         THE COURT:  And was it ever converted from a

13   preliminary injunction to a permanent injunction?

14         MR. FREEMAN:  It was not.

15         THE COURT:  But it still continues in force and effect

16   today?

17         MR. FREEMAN:  It does.  And just to be clear on that

18   point, Your Honor, because this has been a source of discussion

19   between the Deans and Kaiser since January of this year, when

20   the preliminary injunction was entered, just to back up, the

21   Deans told Kaiser they had the electronic records with personal

22   health information.  They refused to return them.  We negotiated

23   over -- to attempt to get access to those so that they could be

24   deleted from their computers, they could be deleted from their

25   e-mail accounts, et cetera.

26         THE COURT:  Since that discussion, did his declaration

27   follow that, saying that it had all been destroyed, or was his

28   declaration before?

1          MR. FREEMAN:  It did.

2          THE COURT:  Okay.  Let me just stop.

3          MR. FREEMAN:  And --

4          THE COURT:  Okay.  Let me just stop you, sir.

5          Sir, do you have any electronic information whatsoever

6  of any Kaiser patient?

7          MR. DEAN:  No.  Your Honor, no.  Your Honor, they want

8  to shake us and hang us upside down.  We don't have anything.

9          THE COURT:  Okay.  Mr. Dean, let me do it one at a

10 time.  Do you have any electronic data whatsoever that has any

11 reference to any Kaiser patient?

12         MR. DEAN:  No.

13         THE COURT:  Next, do you have any hard copies of any

14 written records which in any way relate or refer to any Kaiser

15 patient?

16         MR. DEAN:  No.

17         THE COURT:  Are you preserving any data whatsoever that

18 has anything to do with any Kaiser patient in any form

19 whatsoever, whether hard copy, electronic, or otherwise?

20         MR. DEAN:  No.

21         THE COURT:  Okay.  Ms. Dean, do you agree?  Would your

22 answers be the same?

23         MS. DEAN:  Yes, they would be absolutely the same.

24         THE COURT:  All right.  You may continue.  I

25 interrupted you.

26         MR. FREEMAN:  So -- so at the time this complaint was

27 filed in October of 2012, we knew the Deans had possession of

28 the PHI based on what they had provided to us.  They had refused

1  a request to return it.  They had refused to allow us to access

2  their devices or e-mail accounts to delete it.

3        We filed the complaint.  We got the TRO.  We -- between

4  the time the TRO was entered and the time of the hearing on the

5  preliminary injunction in January of 2010, the Deans submitted

6  declarations saying, "We have deleted everything.  We have

7  deleted all the PHI."  Notwithstanding that, the court entered

8  the preliminary injunction.

9        Subsequent to the entry of the preliminary injunction,

10  we received from the Deans in May of this year three medical

11  record folders and a CD that contained a list of hundreds, maybe

12  thousands, of medical records that they had cataloged.  They,

13  upon -- they notified me of that.  I asked them to return it.

14  They did return it.  And we got rid of it.

15        The reason -- the reason we seek the entry of a

16  permanent injunction is simply to assure that in the event that

17  the Deans discover PHI on their computers, on their phones, in

18  their e-mail accounts, if muddling around in their warehouse

19  they find additional records, they are under an obligation to

20  return that to us without us having to worry about whether those

21  records will be disclosed, used, or any other way --

22        THE COURT:  All right.  Let me stop you.

23        This is not -- you have an opportunity to be heard, and

24  so I'm not asking for a commitment if you have any objection

25  whatsoever, but I do have a question for you.  And the question

26  would be:  Do you have an objection to the preliminary

27  injunction that has previously been ordered simply becoming a

28  permanent order such that should you find any such documents you

1　inadvertently didn't find or see or return earlier, you have an

2　affirmative obligation to return them?  Do you have an objection

3　to the preliminary injunction becoming a permanent injunction?

4　　　　　MR. DEAN:  Yes, we do, Your Honor.

5　　　　　THE COURT:  Okay.  All right.

6　　　　　Anything further?

7　　　　　MR. FREEMAN:  Your Honor, just given the discussion

8　that we have had here today, if the court intends to adopt its

9　tentative, we would, as I have previously discussed, request

10　leave to amend based on the *Kirby versus -- Kirby* decision and

11　the case of *Mediterranean Construction Company versus State Farm*

12　*Fire & Casualty Company*.

13　　　　　THE COURT:  Okay.  Let's discuss that for a minute.  I

14　know that's your fallback position.  And my question to you is:

15　Why wouldn't paragraph 3 of the settlement agreement preclude

16　you from being successful on an amended complaint, specifically

17　as follows:  Under paragraph 3 of the settlement agreement, it

18　indicates about a third -- about a halfway down that paragraph,

19　it starts with -- let's just pick up from the word "thereof,"

20　comma, "and/or each of the aforesaid, collectively referred to

21　herein as 'affiliates,' from all claims, actions, causes of

22　action of any nature and for all liabilities and obligations of

23　every kind and character arising out of or relating to the

24　dispute and any and all claims that were or could have been

25　asserted relating to and/or arising from any of the foregoing,

26　regardless of whether such claims, actions or causes of action

27　have arisen prior to the effective date or arise after the

28　effective date."

1          How is it that any purported amended complaint that you

2   could allege would wind up not being covered by this language

3   that Ms. Burke drafted in the settlement agreement?  And the

4   reason I ask you that is the court is not obligated to grant

5   your motion to amend the pleadings if you cannot legally plead a

6   cause of action that otherwise is not defeated by this

7   settlement agreement under paragraph 3, although I understand

8   the court's obligation to liberally allow pleadings or amendment

9   to the pleadings.  But I just want to ask you.  I don't want you

10  to go through an exercise in futility.  How do you plead around

11  that?

12          MR. FREEMAN:  Based on fraud.

13          THE COURT:  How?

14          MR. FREEMAN:  Your Honor, as I have tried to explain,

15  the parties, at least Kaiser, understood what it had negotiated

16  at the time it entered into the transfer agreement was the

17  return of all of the medical records that the Deans had in their

18  possession.  They were unaware of the Deans' concealment of the

19  fact that they retained electronic records of Kaiser that had

20  personal health information.

21          THE COURT:  Okay.  But then we -- then you are

22  triggered by a fully integrated document.  Are you going to

23  introduce parol evidence to try and defeat paragraph 18, which

24  fully integrates into this settlement agreement all prior

25  agreements, negotiations or understandings?

26          MR. FREEMAN:  Yes.  Your Honor, what it comes down to

27  is the fact that Ms. Burke negotiated this agreement

28  understanding that the dispute that was being resolved was the

1  compensation for the Deans' services.

2      THE COURT:  Despite language to the contrary.  So she's
3  going to submit a declaration to the court saying that "I
4  drafted this release agreement, I chose the words within this
5  release agreement, I made it all-encompassing, but, oh, by the
6  way, I did not intend it to be a fully and completely integrated
7  release agreement, releasing all known and unknown claims" and
8  then specifically making reference to 1534?  She's going to say
9  that?  I mean, she essentially already has.

10     MR. FREEMAN:  She has said that, Your Honor.  And the
11 fact of the matter is that the Deans obviously intentionally
12 withheld that information.  The ink literally on this agreement
13 wasn't dry before Mr. Dean turned around and said, "Hey, I have
14 got more records, and I want $60,000 to return them."

15     THE COURT:  You have not persuaded me that my tentative
16 ruling should be overturned.  I think the language within the
17 settlement agreement establishes as a matter of law that there
18 was a release of all of the claims that are alleged in the
19 plaintiffs' complaint.  And so the tentative order of the court
20 shall become the order as it relates to the motion for summary
21 judgment, and the plaintiff is required to give notice.

22     However, I will grant your oral motion to amend the
23 complaint.  Now, I am doing so only because I think that under
24 the cases that say that I am to liberally construe a party's
25 right to amend the complaint, that I am going to do so.  But I
26 must tell you that it is a close call because paragraph 3 of
27 this complaint may well, unless you can give me authority to the
28 contrary, defeat those other causes of action.

1        I am not ruling on this at this time because I have
2   candidly not done the research, nor have I seen the points and
3   authorities.  But -- so what do you propose the order to be?
4   The motion for summary judgment on these causes of action are
5   granted, consistent with the tentative ruling.  And you are
6   permitted leave to amend.  The order is you file your amended
7   complaint within 30 days from today.
8        Anything on behalf of the Deans?
9        MR. DEAN:  Yes, Your Honor.  We -- you had said to do a
10  proposed order, basically what you said.  But we have also asked
11  in the order that the motion for -- that the preliminary
12  injunction be vacated because we don't have anything.
13  Therefore, there is no -- I guess as a matter of law, how can
14  you tell me to protect something I don't have?  We have had
15  depositions with Mr. Freeman; two of them.  We have told him
16  we -- we had a declaration.
17        And, Your Honor, this situation where I found three
18  records and a disc, I thought he would pat me on the back, thank
19  you, because, Your Honor, the preliminary injunction tells me to
20  return, delete or destroy.  I could have just destroyed it and
21  said nothing.  There is no conspiracy here.  They want my
22  property.  They want my computers.  I want my friend's '68
23  Camaro in his garage, but he won't take a thousand dollars for
24  it.
25        We have an agreement that we are bound together.  If he
26  wants to keep this litigation -- we are not lawyers, but we are
27  getting a little tired of it because we haven't done anything
28  wrong.  We have abided by the agreement.  It's very evident.

1   They are just bullies, and they are using their money to force

2   us to take -- we have lost a half a million dollars.  We have

3   lost our life savings over this fiasco because we said it was

4   wrong to maintain all those patient records without a written

5   agreement and insurance.  They finally gave us one based on the

6   fact that my wife was Hispanic, and that's a fact, in the

7   documents.

8        THE COURT:  You know, I always encourage the parties --

9   you know, sometimes competitive spirits can be aroused on both

10  sides, and I always encourage parties in a good-faith,

11  professional approach to see if they can't resolve their

12  differences.  And so although I am compelled, Mr. Freeman, to, I

13  think, give you leave to amend, I would encourage you to look

14  closely at this settlement agreement and whether or not you can

15  legitimately bring a cause of action for fraud.

16       I mean, inadvertent discovery of records and then

17  giving those to you doesn't seem to suggest a fraudulent intent,

18  but again I'm not ruling on that or I'm not passing judgment on

19  that, and I'm not making any factual determination because I

20  don't know what happened.

21       MR. FREEMAN:  That wasn't the basis for our lawsuit

22  either, Your Honor.

23       THE COURT:  All right.

24       MR. FREEMAN:  The basis for our lawsuit was the

25  withholding of the electronic records, which Mr. Dean in

26  correspondence threatened to disclose, threatened -- went to the

27  press, made disclosures of the fact -- "Hey, I have got this on

28  my computer sitting in my garage.  I'm leaving my garage door

1    open.  Aren't you lucky that nobody stole my computers and got

2    this PHI."

3          THE COURT:  And since then, under penalty of perjury,

4    which is a felony in the state of California, he has represented

5    that all such records have in fact been destroyed and he doesn't

6    possess any.  Now, on the one hand, those comments to you

7    certainly have some inferences that I understand your position

8    and your interpretation.  Since then, having received a

9    declaration under penalty of perjury, both Mr. and Mrs. Dean are

10   running a substantial and significant risk regarding the signing

11   of such a declaration if it's untrue.

12          But be that as it may, unless there is something

13   further, I think I have given this serious and thorough

14   consideration.  And I very much appreciate both Kaiser's

15   position and the Deans' position, and I'm hopeful that you folks

16   can resolve it, otherwise I will for you.

17          MR. FREEMAN:  One final housekeeping matter, Your

18   Honor.  The trial date in this matter is set for September 9th,

19   and I assume that's vacated.

20          THE COURT:  That trial date is vacated.

21          MR. FREEMAN:  I would also ask the court to indulge me

22   in a brief off-the-record discussion once we have concluded the

23   hearing.

24          THE COURT:  Sure.  Is that okay with the Deans?

25          MR. DEAN:  He wants to ex parte, they call it, right?

26          THE COURT:  No.  No.  He wants an off-the-record

27   discussion.  And I don't know if that's to your benefit or not,

28   but I would not have such a discussion outside your presence.

```
 1          MR. DEAN:  Well, Your Honor, one thing before -- I'm
 2   glad to accommodate that.  I guess you are the one that does.
 3   Would you please sign this?  This is what you asked me as far as
 4   your tentative ruling and also --
 5          THE COURT:  I will look at it, but let me tell you --
 6   and I'm -- I want to commend you, sir.  I think you have done a
 7   fine job, not being a lawyer.
 8          MR. DEAN:  Thank you.
 9          THE COURT:  No, I can't sign this because I'm not
10   vacating the preliminary injunction as of today's date.  Also, I
11   have asked counsel on behalf of Kaiser to prepare the formal
12   order.  And because I want to make certain that it is absolutely
13   consistent with the tentative and it addresses his oral motion
14   to amend the pleadings, I'm going to ask him to prepare that.
15   He will send you a copy.  If you have any objections to his
16   proposed order, simply file that objection with the court.  I'm
17   sure it will be absolutely consistent with the tentative,
18   though.  Okay?
19          MR. DEAN:  Thank you, Your Honor.
20          MS. DEAN:  Thank you.
21          THE COURT:  Okay.  We are now off the record.
22          MR. FREEMAN:  Thank you, Your Honor.
23               (Discussion off the record.)
24          THE COURT:  Let's go back on the record.  We have had a
25   short discussion off the record concerning the possibility of
26   engaging in a mandatory settlement conference.  Counsel on
27   behalf of Kaiser and Mr. and Mrs. Dean have indicated that they
28   would like this court to participate and will waive any issues
```

1   regarding my disqualification as the trial judge.

2          Counsel on behalf of Kaiser will prepare the

3   appropriate stipulation and waiver.  And I conduct settlement

4   conferences on a Friday.  I am gone the next two weeks.  Please

5   tell me when would be the earliest and most convenient date for

6   the parties.

7          MR. FREEMAN:  Your Honor, I am available after

8   August 26th.  So --

9          THE COURT:  How is August 30th?

10         MR. FREEMAN:  That's fine for me.

11         THE COURT:  How is August 30th for you folks?

12         MR. DEAN:  Just so -- I need to just have a few things

13  clarified, Your Honor.  First of all, the motion that we have

14  filed today, motion for summary judgment, has been granted.  But

15  you have ruled that you are allowing them to amend their

16  complaint.

17         THE COURT:  Yes.

18         MR. DEAN:  Okay.  So basically Mr. Freeman has asked

19  that we have a mandatory settlement conference, which I believe

20  is required by law.

21         THE COURT:  It's not.

22         MR. DEAN:  Oh.

23         THE COURT:  It's not required.

24         MR. DEAN:  Oh, okay.

25         THE COURT:  The word "mandatory" means that your

26  appearance is mandatory.

27         MR. DEAN:  Oh.

28         THE COURT:  I'm not required to set a settlement

1   conference unless I believe that it would be of benefit to the

2   parties.

3        MR. DEAN: So my question is, let's say we go to that

4   and then, you know, we just get this offer from Kaiser, which is

5   basically nothing, and we say, "No, we want to go ahead, and

6   let's go to trial." And we understand you would be the judge,

7   which we are totally fine with. Is that what you are saying,

8   that we would still have the option, if we can't settle it, to

9   go to trial?

10       THE COURT: Well, you do except for the following: I

11  don't think -- there wasn't a cross-complaint filed in this

12  case, is there? Okay. So --

13       MR. DEAN: Well, Your Honor, actually we were going to

14  file one.

15       THE COURT: But it's too late.

16       MR. DEAN: Yeah.

17       THE COURT: You didn't file one. If the case can't be

18  settled, then the next thing that will happen is they are going

19  to file an amended complaint. You are going to probably file

20  another motion, and then I'm going to make a determination

21  whether any other causes of action survive this settlement

22  agreement. Ultimately, if -- and I'm not prejudging it because

23  I haven't seen it yet -- but if I were to make a determination

24  that any new amended complaint does not survive the settlement

25  agreement, then the case is over and you win.

26       MR. DEAN: And is that, like, done with -- what do you

27  call it? -- without prejudice or --

28       THE COURT: With prejudice.

1          MR. DEAN:  That means they can file again or no more?

2          THE COURT:  No.  No.  It's over.

3          MR. DEAN:  Okay.

4          THE COURT:  I mean, they can appeal it.  I mean -- and

5     so I can't tell you that it is absolutely over.  As far as this

6     court would be concerned, it would be over.  But then they would

7     have a right to appeal it to the court of appeal, arguing that I

8     made an erroneous ruling by granting this motion.  Okay?

9          MR. DEAN:  Yes.

10         THE COURT:  So if you want to have a settlement

11    conference, I'll give you the time.  Would you like to do this,

12    Mr. Dean?

13         MR. DEAN:  Yes, Your Honor.  And, like, in the

14    meantime, maybe -- maybe Kaiser may decide to, you know --

15         THE COURT:  I'll let you discuss that with them.

16         So the matter will be set for a settlement conference

17    on August 30th, at --

18         THE CLERK:  Ten.

19         THE COURT:  -- at 10:00 a.m.

20         THE CLERK:  Here.

21         THE COURT:  You know, I apologize.  Am I gone the 26th?

22    I am, right?

23         THE CLERK:  That's for the CEO.

24         THE COURT:  Okay.  I think I leave the afternoon of the

25    30th, because I'm gone the following week.  I'm thinking about

26    setting it the 29th.

27         THE CLERK:  You can have them come in at 9:00 or 9:30

28    if you want.

1        THE COURT:  Let's set it for nine o'clock on Friday the
2    30th.  And so I'm going to allocate -- I'm going to allocate
3    two, two and a half hours.  Will that be enough time, in your
4    view?

5        MS. DEAN:  Yes, sir.

6        MR. FREEMAN:  I think so, Your Honor.

7        THE COURT:  Okay.  And if it took longer than that, I
8    would want to set it on a different date.  I'm leaving -- I
9    think I leave that afternoon.  Okay?

10        MR. FREEMAN:  To be safe, can we pick a different date?

11        THE COURT:  Sure.  Let's pick September 13th at
12    10:00 a.m.  Okay?

13        Thanks, folks.

14        MR. DEAN:  Thank you, Your Honor.

15        MR. FREEMAN:  One other housekeeping matter.  Let me,
16    if I could, Your Honor, just check my calendar that date.

17        I have a case management conference I'm required to
18    attend that date, Your Honor.

19        THE COURT:  Where?

20        MR. FREEMAN:  L.A. Superior Court.

21        THE COURT:  Can you appear by CourtCall in L.A.?

22        MR. FREEMAN:  I guess I could, yeah.

23        THE COURT:  Okay.  Otherwise I have got to go to
24    September 20th, and now we are getting it so far --

25        MR. FREEMAN:  Yeah.  I appreciate that, Your Honor.  I
26    will attend by CourtCall.

27        THE COURT:  Okay.  The matter is set for the 13th of
28    September.  Thank you for coming in.  Have a good day.

1        MR. FREEMAN:  One other point.

2        THE COURT:  Yeah.

3        MR. FREEMAN:  Since we are going to have this

4 conference, and our motion to amend is required to be filed

5 within 30 days, can we extend that until after our attempts to

6 resolve this?

7        THE COURT:  Your amended complaint will be due on or

8 before September 20th.  That's the week after the settlement

9 conference.

10       MR. FREEMAN:  That's fine, Your Honor.  Thank you.

11       THE COURT:  Okay?

12       Thank you, Mr. and Mrs. Dean.

13       MR. DEAN:  Thank you.

14       MS. DEAN:  Thank you.

15       THE COURT:  Thank you, Mr. Freeman.

16       Have a good day.

17       MR. FREEMAN:  Thank you.

18       THE COURT:  The court is in recess.

19            (Proceedings concluded.)

20

21

22

23

24

25

26

27

28

REPORTER'S CERTIFICATE

KAISER FOUNDATION HEALTH PLAN, INC.,    )
and KAISER FOUNDATION HOSPITALS,        )
                                        )
                        Plaintiffs,     )
                                        )
              vs.                       ) Case No. INC1207224
                                        )
STEPHAN CHRISTOPHER DEAN, LIZA          )
DEAN, DBA SUREFILE FILING SYSTEMS,      )
and DOES 1-10, Inclusive,               )
                                        )
                        Defendants.     )
_____     )


        I, Terri L. Dickneider, Certified Shorthand Reporter

No. 5031, hereby certify:

        On July 31, 2013, in the county of Riverside, state of

California, I took in stenotype a true and correct report of the

testimony given and proceedings had in the above-entitled case,

pages 1-37, and that the foregoing is a true and accurate

transcription of my stenotype notes and is the whole thereof.


DATED:   Indio, California; August 4, 2013.




                        _Terri L. Dickneider_____

                        TERRI L. DICKNEIDER, CSR No. 5031




                  TERRI L. DICKNEIDER, CSR